During the summer of 1935 Ralph Christie, a single man, 21 years of age, was employed by the Robinson Construction Company, one of the respondents, as operator of a gasoline tractor, known as a "caterpillar." He was also the repair man for the "cats" (so-called in common parlance). The company was engaged in constructing roads in Valley county and elsewhere in the state. Ralph resided at McCall with his mother and younger brother. His wages were $4.80 per day (working seven days each week) which he usually turned over to his mother to pay for household expenses, etc.
Appellant and her son, Ralph, had planned to attend a high school play at McCall on Saturday evening, October 26, 1935. Ralph went to the timekeeper's office to draw $5, to pay their "fees" for the play. When he returned home about a half hour later, he informed his mother that he couldn't go to the play with her; that he had "to go to Boise after Harry" and "to purchase some repairs for the cat." Harry Totten, also a caterpillar operator, was Ralph's half-brother. "He had been recommended as a very good man" and was asked by the superintendent to "come over and go to work." Dewey Hindman, patrol operator for the construction company, received a telephone call from Totten, requesting Hindman to come to Boise after him. Hindman drew $5 from Vic Milward, the timekeeper, for expense of trip, and while in the latter's office he overheard a conversation *Page 61 
between Vic and Ralph in relation to the latter going to Boise and getting certain parts for the caterpillar.
Ralph and Hindman left McCall about 10 o'clock P. M. and stopped at the rock crushing plant in Lake Port, where Ralph told Dailey, the superintendent of the construction company, that he was going to Boise and "would get the hearing for the cat" if he wished him to. Dailey said he would appreciate that and would allow him for his time spent in Boise for the company. Hindman and Christie arrived in Boise between two and 3 o'clock Sunday morning, October 27th. They found Totten and tried to locate some of the employees of the Bunting Tractor Company to get the repair parts. All during that day Christie endeavored to find some one of the employees of the company, by either calling at the company's office or personally calling at their residences, or trying to reach them by telephone. About 7 o'clock Sunday evening, Totten, Hindman and Christie started on their return trip to McCall; Hindman drove as far as Horseshoe Bend and "Ralph took the wheel then." About six or seven miles from the latter place they passed a car and "quite a ways behind there was another one with their bright lights on." The traffic was "awful heavy." Ralph was driving the car over on the right side of the road, as shown by the investigation afterward. "A little ton and a half Diamond 'T' truck carrying an Illinois license" struck the left cowl light of the Hindman car, causing the car to cross over and hit the left back slope of the road and rolling the car on its side. They landed 144 feet from where the car first hit. Ralph sustained a personal injury from which his death occurred about fifty minutes later.
Claim for compensation was made by the mother and brother of deceased, and a claim was also filed by the state for $1,000. Hearing before the industrial accident board resulted in the board's denying the claims and dismissing the applications. From an order of the district court, affirming the board's order and decision, this appeal is taken.
It is contended by appellants and denied by respondents that the accident, which resulted in the death of Ralph Christie, arose out of and in the course of his employment by respondent construction company. *Page 62 
Since this case turns entirely upon the sufficiency of the evidence to support the award of the board, we are setting forth herein the entire evidence contained in the record bearing on the cause of the decedent making the trip from McCall to Boise, the real purpose or purposes of the trip, and the circumstances which induced him to make the trip; and what he did from the time he left McCall until he met with the accident on his return trip. The respective witnesses testified substantially as follows:
Sadie Christie, mother of decedent, told of the plan of Ralph and herself to go to the high school play Saturday evening; that he went down to the construction company's office to draw $5 to pay their "fees into the doings"; of Ralph's return home in not "quite a half hour";
"Q. Will you state the conversation had between you and Ralph as near as you can relate it?
"A. He said to me, 'Mamma, I can't go to the play' and I asked him 'why' and he said 'I have got to go to Boise after Harry and I have got to purchase some repairs for the cat' — that is the caterpillar and they call it the cat. I asked him why he had to go. He said the bookkeeper over there or the superintendent says I have got to get parts for the cat.
"Mr. LANGLEY: Q. Who is the bookkeeper or superintendent you refer to?
"A. High Dailey. He said he had to have parts for the cat and Harry, his half brother to come back Monday morning to go to work on one of the shifts on the cat. He says 'I will be back Sunday morning.' "
Elmer Christie, decedent's brother, testified that he
"asked Vic [timekeeper for respondent] if Ralph went down of his own accord after this caterpillar part just to be going or if they had sent him and Vic said they wanted him to go down after those parts, that Ralph didn't want to go because him and mother was going to the high school play; that Ralph had been there and drew $5.00 to go to the play on and that Ralph didn't want to go and miss that because he and mother had not been out very much together. He said Hindman had to go after Harry and they wanted to go and pick up those parts in Boise." *Page 63 
Dewey Hindman, patrol operator for the company, testified that he went to the timekeeper's [Vic Milward] office between 9:30 and 10 o'clock; and of receiving a telephone call from Harry.
"A. I received this telephone call and I went down to draw some money and told Vic I was coming here after Harry so he could go to work. Vic wrote me a check for $5.00. Ralph Christie was in there at the time.
"Q. At that time was any further conversation had? Just say 'yes' or 'no.'
"A. No.
"Q. None between you and Vic. Was there between Vic and somebody else?
"A. Only between Vic and Ralph.
"Q. Will you relate that?
"A. Vic asked Ralph why he didn't see High [High Dailey, superintendent] and go down and get these cat parts and for him to go down and see High at the crusher.
"Q. Did you hear him ask that?
"A. Yes, that was part of the conversation.
"Q. What else was said?
"A. Vic told Ralph we had to get these machines to going and he could get hold of the fellows in Boise and get the parts and get them and get back early that night."
Hindman and Christie then got Hindman's car and "went down to Harry's house and then to Ralph's mother's and told her we were going and started right out then."
"Q. Where did you and Ralph go after you had stopped at Ralph's home?
"A. We went out to the crusher at Lake Port.
"Q. How far from McCall?
"A. Approximately six miles I think.
"Q. Who did you see out there?
"A. High Dailey the superintendent.
"Q. The superintendent of the Robinson Construction Company on this job?
"A. Yes.
"Q. Was there any conversation had with High Dailey?
"A. Nothing only we stopped and hunted him up. I told him I was going to Boise after Harry and that Vic had instructed *Page 64 
Ralph to go and get these parts. He asked what was the matter with the cat and Ralph told him and he said to go ahead and get back as quick as we could.
"Q. Was that all the conversation that was had?
"A. All except I told High I would be back to go to work the next morning.
. . . . . . . . . . . .
"Q. Will you repeat the conversation between you and Ralph Christie when you came into Milward's office that night?
"A. I told him I was going to Boise and he asked me what for and I told him. Vic asked him to go along and get these cat parts and also asked him if he didn't know these Bunting Tractor Company boys in Boise.
"Mr. SUPPIGER: What is that?
"A. Vic said for Ralph to come along and get these parts, that he was well acquainted with these employees and possibly he could get them early in the morning and get back before time to go to work.
"Mr. SUPPIGER: Was that the conversation?
"A. That was part of the conversation, yes, and Ralph he objected as him and his mother was going some place that night, but he finally consented to go.
"Q. Did you ask Ralph to go down to Boise with you?
"A. I asked him why he didn't come along.
"Q. You asked that?
"A. Not until after Milward told him to come along. Then I told him I would rather have company than go alone.
. . . . . . . . . . . .
"Q. That conversation you stated took place between you and Vic Milward, didn't take place at all, did it?
"A. Not between me and Vic. The conversation took place between Ralph and Vic in my presence.
"Q. In your presence?
"A. Yes, pertaining to him coming to Boise in the car with me.
"Q. You drove on down to Lake Port where the crusher was?
"A. Yes.
"Q. How far off the road is that crusher? *Page 65 
"A. It is approximately six miles from McCall and about a half mile off the road."
Hindman and Christie did not remain at the crusher over five or ten minutes; Dailey just told the decedent "he was to get the bearing for the caterpillar tractor," and "to get whatever gaskets he needed to get it in operation."
As to their authority to use the company's gas, Hindman testified that they were not specifically told to use company gas for that one trip. The car belonged to Hindman but by agreement it was used for company business, the company furnishing the gas. The timekeeper had given Hindman authority to get gas at the service station while he was on the job; that during the six weeks work he "never bought any gas" himself. Christie had been using the car the day they left for Boise and had put in gas at the plant; and they took a five-gallon can of the company's gas "to come back on."
They arrived in Boise the next morning between 2 and 3 o'clock, stopping at Cascade to eat and having two flat tires on the trip down. On reaching Boise they found Harry and attempted to locate some of the Bunting Tractor Company employees, to get the repair parts. Hindman was with Ralph until about five or after in the morning, when Ralph went down to the house of some friends named Rea. He next saw him about 2 o'clock that afternoon. From that time until late in the afternoon they drove around and telephoned various of the tractor company's employees but were unsuccessful. Hindman testified: "I expect we tried a dozen times." Christie, Hindman and Totten finally had supper and left Boise "around seven" for the return trip to McCall. Hindman drove the car as far as Horseshoe Bend and "Ralph took the wheel then." The wreck occurred six or seven miles beyond Horseshoe Bend.
Vic Milward, timekeeper for the construction company, testified as follows:
"Q. In what capacity was Ralph employed?
"A. His main capacity was cat driver.
"Q. Also as a repair man for these cats? *Page 66 
"A. He did most of our repair work up to the time of hisdeath . . . . Ralph was the best of the two repair men in McCall."
Testimony follows, with reference to the night of October 26th, when Hindman and Christie made the trip from McCall to Boise:
"Q. Did you have a conversation with Christie at that time?
"A. Yes, some.
"Q. State what that conversation was.
"A. Ralph came to the office and asked if he might draw $5.00. He said he knew pay day wasn't until Monday but that he would like to go and celebrate a little bit.
"Q. Was anything further said?
"A. Nothing that I remember. I wrote the check and gave it to him.
"Q. While Ralph Christie was still in the office, that same evening, what, if anything else, occurred?
"A. Right after Ralph had taken his check Dewey Hindman came in. He came in apparently to find Ralph because he started talking to Ralph. . . . . They talked it over and Dewey asked if he could draw $5.00 and I gave him his check.
"Q. After that did both Ralph and Dewey leave the office?
"A. Shortly after that.
"Q. Did you see them any more that night?
"A. No.
"Q. Or the following day?
"A. No.
"Q. Did you have any conversation with Hindman other than the conversation relative to issuing him a check for $5.00?
"A. Not that I remember.
"Q. State whether or not you told Hindman anything about getting parts for a tractor in Boise?
"A. I did not.
"Q. State whether or not you told Christie anything about getting tractor parts in Boise?
"A. No.
"Q. Would you say that the matter of getting parts for this tractor that was broken down was not mentioned when any of you three were in the office? *Page 67 
"A. Not in my memory. I have no recollection of it being brought up.
. . . . . . . . . . . .
"Q. You do know, however, that Ralph stated he did not want to go to Boise that Saturday evening?
"A. Yes.
"Q. And you do know the caterpillar needed those parts particularly?
"A. I do. I ordered them.
"Q. You know the Bunting Tractor Company was the company from whom they were to be sent?
"A. Yes.
"Q. And you do know Ralph made some effort to obtain those parts?
"A. Yes, from the testimony I have gathered that he did.
"Q. Ralph would be the man, would he not, to put them in the machine and make the repairs as soon as they arrived?
"A. I presume Ralph would have done the work, either he or Ralph Compton.
"Q. He was a good worker, was he, Ralph, I mean?
"A. Yes, very good.
"Q. And a good repair man?
"A. Yes, very good.
"Q. And isn't it true, in the office that you did fill out the papers ready to be submitted to Morey Robinson?
"A. After I gathered the information I put everything down on the prescribed form so I would have it correct.
"Q. Did you sign for them?
"A. No.
"Q. Did you submit them to Morey Robinson?
"A. Yes, along with the evidence I gathered, through conversation with all the parties.
"Q. You do know that Ralph and Dewey saw High Dailey that evening before they came to Boise?
"A. Yes."
High Dailey, superintendent of the construction company, testified as follows:
"Q. Calling your attention to the 26th of October, 1935, state if you saw Ralph Christie that day, and if so what time and where? *Page 68 
"A. It was in the evening some time, after dark, I couldn't say the exact time it was. He stopped at the rock crushing plant out at Lake Port and said he was going in to Boise and that he knew the Bunting Tractor Company, some of the employees down there, and he would get the bearing for the cat if I wished him to. I told him I would appreciate it if he could help us out and that I would allow him time for his time spent in Boise, for what time he spent for the company in Boise.
"Q. When you said allow him for the time spent in Boise was that while he was engaged in attending to this business, attempting to secure the parts?
"A. Yes.
"Q. How long was Ralph at the rock crusher?
"A. Ten or fifteen minutes, I guess, about.
. . . . . . . . . . . .
"Q. With respect to men going to town after parts, was there any custom with respect to sending the men after parts or their going after them?
"A. One man that worked up there made trips to town on his own accord and one time he brought an acetylene tank down for me and I allowed him three dollars for the time for making that trip for me.
"Q. Was the compensation in that case for the time spent in securing the equipment in Boise?
"A. Yes.
"Q. Are you familiar with the arrangements that had been made between your company and Dewey Hindman for the use of his car for transporting himself and other men back and forth between the job and McCall?
"A. He was to use his car to ride back and forth from the work in and also to haul some of the other men. I told him he could have his gas and oil for his car while it was used on the works for going back and forth.
. . . . . . . . . . . .
"Q. Do you remember the conversation that was had on October 28, when Edlefsen was present and Morey Robinson was there and you were there, about this death?
"A. Yes.
"Q. Did you hear Mr. Edlefsen testify at one thirty? *Page 69 
"A. Yes.
"Q. And did you hear him state a certain conversation which was had between you and him?
"A. Yes.
"Q. And that was to the effect that the papers were being filled out on this case and being sent to Boise?
"A. Yes.
"Q. Was that true?
"A. Yes.
"Q. And that Ralph was going to bring these cat bearings back so this tractor could be gotten in shape the following Monday morning?
"A. Yes.
"Q. And that was also true?
"A. Yes.
"Q. And that Ralph was on part time pay?
"A. I don't believe that was mentioned.
"Q. He was on some kind of pay during that time, that was mentioned to Mr. Edlefsen, wasn't it?
"A. Just as I mentioned it now. He promised to bring themback and I promised to pay him for his time and trouble inBoise.
"Q. How long does it take you to drive from McCall to Boise ordinarily?
"A. I drove it once in three hours.
"Q. You would know, would you not, if the tractor parts had been available, it would not have taken five minutes to go and get them?
"A. It would not have taken very long.
"Q. Would that be all the time you would pay Ralph for?
"A. No, I would have paid him for a couple or three hours, orsomething of that kind, allow him that much time for histrouble.
"Q. Allow him something reasonable?
"A. Yes.
"Q. A few hours at least?
"A. Yes. He was making an effort to help us.
"Q. All the efforts he was using, you knew were to the best interests of your company at that time?
"A. Yes. He was that kind of a man." *Page 70 
As to Harry Totten coming to work for the company, Dailey said:
"I had seen Harry and asked him to come and look us up but I didn't know he was coming on that job . . . . We had used him on other caterpillars though . . . . He had been recommended as a very good man and I told him he could come over and go to work when he was available to go to work."
Russell Edlefsen, acting resident engineer with the department of public works, on the McCall road project, testified:
"A. I was the agent of the state to see the work was performed as it should have been and to check the labor specifications on the job.
"Q. With reference to the equipment used on the job, was there sufficient at all times to carry on the work?
"A. Not at all times, no.
"Q. Particularly during October 25, 26 and 27, about that time, what was the condition with reference to the equipment, as to carrying on the work?
"A. We only had one cat at work at that time.
"Q. How many cats were on the job?
"A. I think three at that time.
"Q. Were they all in working order at that time?
"A. Just one as I recall.
"Q. What happened — what was wrong with the others, if you know?
"A. A burned out bearing in one and the final drive out of the other cat. It may be possible there was two.
"Q. Did you know High Dailey?
"A. Yes.
"Q. Do you know what position he held with the Robinson Construction Company?
"A. He was superintendent.
"Q. On this job?
"A. Yes.
"Q. Did you know Vic Milward?
"A. Yes.
"Q. What position does he have?
"A. Time keeper in the office.
"Q. Do you know Ralph Christie?
"A. I did. *Page 71 
"Q. What occupation did he follow?
"A. He ran the cat most of the time.
"Q. Was he employed by the Robinson Construction Company or the State of Idaho?
"A. By the construction company.
"Q. Do you know what duties he was performing on or about October 26, 1935?
"A. With the cat — they were working with the cats, about stripped the gravel pit. One cat was working in the pit and the other two were laid up.
"Q. Did you make any complaint to anyone concerning the shortage of equipment at that time?
"A. Yes.
"Q. To whom?
"A. Morey Robinson and High.
"Q. Was Morey Robinson a member of the construction company?
"A. I think he is vice-president. He is C. A. Robinson's son.
. . . . . . . . . . . . .
"Q. And to whom else did you complain?
"A. High Dailey.
. . . . . . . . . . . . .
"Q. Do you recall the incident of Mr. Christie's death?
"A. Yes.
"Q. After his death occurred, did you have any conversation with Mr. Dailey or Mr. Robinson or Mr. Milward?
"A. Yes.
"Q. And when was that?
"A. Monday morning, I don't know the date.
"Q. The Monday following the Sunday his death occurred?
"A. Yes, Monday morning.
"Q. Who was present at that conversation?
"A. High and I and Morey Robinson were there. I am not certain if Mr. Milward was there at the time or not.
"Q. Where was this conversation?
"A. About three miles south of McCall right near where the cat was.
"Q. Will you relate the conversation had and by and between whom? *Page 72 
"A. It was myself and High Dailey and Morey Robinson and there was a couple other fellows there. I don't know who they were but it might have been the one with me and the one with the cat. I think that is the first time I heard about Christie's death. I was told —
"Q. By whom?
"A. Mr. Dailey and Mr. Robinson that he had come down toBoise to get the cat bearing for the cat.
"Q. Who do you mean by `he'?
"A. Ralph Christie and that he was going to bring Harry Totten back to work on the cat and I asked him if he knew whether he had the bearing with him when he was killed, but they were not certain because neither Mr. Hindman or Totten returned after Christie's death.
"Q. Was anything else said?
"A. I asked — we got to talking about the injury and the insurance and I asked if they thought — I asked about the insurance and they said he was on part time pay.
"Mr. ZAPP: Who is that?
"A. Mr. Dailey and Morey Robinson and I asked them if — I didn't know about the Insurance Fund, I didn't know how they paid their claims, and I asked if they thought he was eligible to the insurance and if his mother was and they said they didn't see why he would not be and the claim would be filled out and sent in to Boise."
Harry Totten, half-brother of Ralph Christie, testified to a telephone conversation with Hindman, asking him to come down to Boise after him, so he "could be back in McCall to go to work"; that he was going up to Rhodes' camp which was rented to Robinson. He also verified Hindman's testimony as to Ralph's many attempts to locate a mechanic and other employees of the Bunting Tractor Company, while Christie and Hindman were in Boise; that they intended to get back to McCall, "just as soon as they could get the parts" for the tractor. He also testified to the accident and a conversation between Milward and John Smead, concerning Christie's death; that Milward said, "Ralph was on the payroll and he was going to turn in the papers for the insurance." *Page 73 
Dave Callendar, conducting a mercantile business at Lake Fork, testified to placing a telephone call between Robinson at Boise and Dailey in McCall, shortly after Christie's death; that Dailey told Robinson that "Christie was down after the parts"; that "he was allowing him for the time for his trouble on the parts for that caterpillar tractor that he was picking up from Boise . . . . He said that three or four times that he was allowing him money in some way."
Charles Rea of Boise, a friend of Christie's and his mother, Bertha Rea, both testified to Ralph's coming to their home early in the morning of October 27th; that Ralph said he had to look up someone so he could get in the Bunting Tractor Company and get some parts; that he and Charles went down to the tractor company's office and tried to call several of the company's employees.
Gordon Brown, at whose home Hindman resided when in Boise, testified that he met Christie in October, 1935; that at his home on the 27th of that month Christie tried to call the tractor company.
"A. Ralph called up the Bunting Tractor Company and tried to find the manager, I believe.
"Q. Do you know who he called?
"A. No, I don't.
"Q. How do you know he called up the Bunting Tractor Company or even tried to call them?
"A. I know because he called from my phone up there. He wanted to get the manager or somebody that worked there for a part is what he told me.
"Q. Did you hear him make any statement concerning getting in touch with the Bunting Tractor Company?
"(Objection to this question overruled.)
"Q. At the time, will you relate any conversation or remarks that Mr. Christie made concerning the purpose he was here for or his desire to get in touch with the Bunting Tractor Company?
"A. He made the remark that he had some repairs to get for a cat or caterpillar or whatever it is that he was, I believe, operating at the time.
. . . . . . . . . . . . . *Page 74 
"A. We started out, I believe, around ten thirty and went back to the house, I believe around four o'clock . . . . we covered the whole north of Boise . . . . To try and locate a party that is connected with the Bunting Tractor works . . . . There was three different parties they wanted to get hold of and anyone of the three would have been all right.
"Q. Did you go to the Bunting Tractor Company works?
"A. We went down there two or three times.
"Q. Was any of the time consumed on purposes of your own or otherwise, during this trip, that is personal to you or Christie or Dewey Hindman?
"A. No.
. . . . . . . . . . . . .
"Q. How many trips did you people make back to the Bunting Tractor place of business?
"A. We were there three or four different times and there was three different times we stopped and he went and called up different parties and tried to locate someone connected with the company.
"Q. You stated this consumed until about four o'clock.
"A. Roughly, yes.
. . . . . . . . . . . . . . .
"A. We got supper then and were there until they left town . . . . Sometime between six and seven, I believe."
It is apparent from the foregoing evidence that the trip decedent was making at the time of his death was at least in part devoted to the service of the master; and it is equally apparent that it was not wholly, if at all, devoted to the pleasure or personal advantage of the decedent; nor can it be correctly asserted that he would have made the trip for either of the purposes alone without the other purpose existing concurrently. The only material dispute or conflict in the entire record is that between the testimony of Hindman, patrol operator for the company, and Milward, timekeeper for the company. Hindman says that: "Vic asked Ralph why he didn't see High [the superintendent] and go down and get these cat parts, and for him to go down and see High at the crusher." Milward denies saying this but admits having a conversation with Ralph at the time and place mentioned by Hindman. The conflict in this evidence *Page 75 
is immaterial, for the reason that its chief purpose (if it occurred) was to request or direct Christie to see the superintendent and receive authority and instructions to get the cat parts. That purpose was accomplished whether by direction of the timekeeper, or by chance or design; and he did see and talk with the superintendent who told him he "would appreciate it if he could help us out and that I would allow him time for his time spent." The fact, that he drove six miles to the crusher to see about attending to this business for the company, makes it quite clear that he proposed that, if he made the trip, it should be of service to his employer as well as "company" for Hindman on the drive.
It is undisputed that after he reached Boise he made apparently every possible effort to contact some officer or employee of the Bunting Company in order to get the parts required. Indeed, it was the time occupied in making inquiries through the city to locate someone (of the Bunting Company) that delayed their departure from Boise on their return trip. Had they not been delayed in making these efforts to secure the parts for the "cat," they would not have met the truck where they did and the accident would probably not have happened. It should also be remembered that Hindman, with whom Christie rode down to Boise, testified that he had not said anything toChristie about making the trip down with him until after thetimekeeper spoke to Christie about coming down and getting theparts and then it was that Hindman said:
"A. I asked him why he didn't come along?
"Q. You asked that?
"A. Not until after Milward told him to come along. Then I told him I would rather have company than go alone."
It is now contended by respondents that the accident did not arise out of and in course of Christie's employment and that the matter of securing or "picking up the parts" was a mere incident in Christie's journey to Boise. Respondent quotes and urges the following from Marks v. Gray, 251 N.Y. 90,167 N.E. 181:
"The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some *Page 76 
purpose of his own. Clawson v. Pierce-Arrow Motor Car Co.,231 N. Y. 273, 131 N.E. 914. If, however, the work has had no part in creating the necessity for travel, if the journey would have gone forward though the business errand had been dropped, and would have been canceled upon failure of the private purpose, though the business errand was undone, the travel is then personal, and personal the risk."
Respondent also cites Barragar v. Industrial Com.,205 Wis. 550, 238 N.W. 368, 78 A.L.R. 679, which quotes from, follows and approves the Marks-Gray case, supra. Our attention is also called to Dameron v. Yellowstone Trail Garage, 54 Idaho 646,651, 34 P.2d 417, in which this court said:
"The general rule that compensation is not allowed for injuries sustained while employees are going to or coming from their work, has been held not to apply to cases where employees, on either their own or their employer's time, are going to or from their employment or some substantial mission for the employer growing out of the employment."
The foregoing quotations state the law on the subject as we understand it.
As has often been said, it is not possible to state a rule by which we can determine in all cases just when an employee is engaged in the work of his master, and when he can be said to have stepped aside from the course of his duty. Nor is it possible to state a rule, fixing just the extent and degree of service that the servant must be engaged in and performing at the time of an accident, as compared with the degree or extent to which he was going about his own business or recreation, in order to sustain or defeat a recovery. One of respondents' leading cases, Barragar v. Industrial Com., supra, recognizes the fact that if the service of the master was a concurrent cause of the trip, which the servant was taking at the time of the accident, the master would be liable for compensation. It is there said:
"The application of this test does not require or authorize the commission to weigh the motives and objects of the employer and employee for the purpose of ascertaining the most important or compelling cause as well as the secondary cause of the journey. It simply requires the commission to *Page 77 
find that the service of the employer is at least a concurrentcause of the trip."
Now it is apparent to us from the whole record that Christie did not make the trip primarily or chiefly for either pleasure or company for Hindman. He was the company's "cat" repair man and was a faithful and loyal employee, who at all times sought to advance the work and interests of his employer. This latter statement is not only admitted but is affirmatively stated by respondent's superintendent. When Christie learned that Hindman, a fellow servant, was making this hurried trip to Boise to bring back another cat operator, he at once sensed an opportunity to get the needed parts and thereby speed up the work and better serve his employer. He accordingly took the matter up with the timekeeper, Vic Milward (according to Hindman), and later (admittedly) with the superintendent, Dailey, and received authority and instructions to get the parts required. He was to be compensated for his time. The trip, for either or any purpose from McCall to Boise, was over the same roadway, so that no extra trip or detour was necessary for either serving the purposes of the employer or the employee. The services of the employer did require extra travel in Boise where Christie endeavored to locate some officer or employee of the Bunting Tractor Co.; but that part of the trip became wholly unimportant, except to show service for the employer, because no complaint is made of anything that happened on these detours of inquiry and phone calls. Upon the whole record as it now stands before us, we do not think it can be fairly said that Christie would have made the trip to Boise that night with Hindman, had it not been combined with the chance of securing the parts necessary to repair the disabled cat and putting it back into service on the following Monday morning. If not the paramount cause of the trip, it was undoubtedly a concurrent cause. In this respect the findings of the board are not supported by the evidence. The accident which caused the death of Ralph Christie arose out of and in course of his employment by respondent company.
No contention is made on this appeal that any error was committed in denying the claim of Elmer Christie. The *Page 78 
order and judgment of the board in denying compensation to Sadie Christie, the mother of decedent, and the order of the district court in affirming the same, are reversed and the cause is remanded with direction to enter an order in favor of appellant, Sadie Christie. The judgment is affirmed as to the denial of award to Elmer Christie. Costs awarded to appellant, Sadie Christie.
Budge and Givens, JJ., concur.
Holden, C.J., did not sit at the hearing or participate in the decision in this case.
Morgan, J., deeming himself disqualified, did not sit at the hearing and took no part in the decision of this case.