283 P.2d 590

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Danny Nick PULLOS, Defendant-Appellant.**

No. 8236.

Supreme Court of Idaho.

May 4, 1955.

Anderson & Anderson, Pocatello, for appellant.

Graydon W. Smith, Atty. Gen., J. Clinton Peterson, T. J. Jones, III, Asst. Attys. Gen., Hugh C. Maguire, Jr., Pocatello, for respondent.

SMITH, Justice.

The information charges that on February 9, 1953, appellant did offer and give a bribe of $50 to one Benham, a liquor law enforcement officer of the department of law enforcement for the liquor law division of the State of Idaho charged with enforcement of the liquor laws of this State with intent to unlawfully, wilfully, corruptly and feloniously influence such officer to receive or secure immunity from arrest, prosecution or punishment for a violation or contemplated violation of the liquor laws of this State.

The trial court overruled appellant's motion to quash the information and his gen-

eral and special demurrer thereto. He then pleaded not guilty to the charge. He represented himself in the ensuing trial which resulted in his conviction January 5, 1954.

March 1, 1954, the trial court ordered the sentencing of appellant to be withheld for three years and that he be paroled on specified conditions. July 7, 1954, appellant moved the court for revocation of the order placing him on parole, that he be permitted to furnish bond and, that the court hear and determine his motion for new trial, which motion the court thereupon denied.

September 27, 1954, the trial court sentenced appellant to serve a term in the state penitentiary not exceeding five years, and that he pay a fine of $1,000 provided, that if he pay the fine within ten days the trial court would revoke the requirement of penitentiary servitude, to which sentence appellant registered objection. The trial court then granted a certificate of probable cause, and thereupon, through his present counsel, appellant perfected his appeal.

Appellant has assigned the insufficiency of the evidence to sustain his conviction of the charge of bribery.

Respondent's case upon which it must rely to sustain the conviction of appellant of the charge of bribery, developed from testimony of its law enforcement officers, appears to be as follows:

The Sunday afternoon of February 8, 1953, at about 4:15 P.M., appellant told Officer Benham, in front of the latter's residence in Blackfoot, "how hard it was for him (Pullos) to operate the Phoenix Bar in Pocatello without making some kind of a violation there." Appellant asked the officer's house number and inquired his address two or three times; then upon leaving, appellant remarked to the officer, "George, if you should receive a letter that isn't signed through the mail, you will know who it is from." The next day the officer received a letter entirely typewritten, including the name "Bill" of the ostensible sender, reading as follows:

"Dear George:

"Enclosed please find a little to apply on my debt to you. I feel that I can sent you a like amount each week. As I told you at any time everything isn't satisfactory please let me know and I'll correct things. Hope this is satisfactory.

"Thanks. * * *
"Bill"

The letter enclosed $50 in currency.

Late afternoon of February 9th, Officer Benham met with appellant in a tourist cabin at Pocatello. Four additional officers, unbeknown to appellant, occupied an adjoining room; they had connected up a machine for tape recording the conversation of Benham and appellant. One officer in the adjoining room made some observations of Benham and appellant through a hole in the door occasioned by removal of the door knob; such officer also caught snatches of the conversation of Benham and appellant.

Officer Benham confronted appellant with the typewritten letter and the $50 in currency and inquired what he, Benham, was expected to do for the $50. Appellant denied knowledge of the $50 but neither admitted nor denied the letter. Several similar versions of ensuing converation show, in effect, that if Officer Benham, in checking the place of business in Pocatello, which appellant managed,—the Phoenix Bar,—found a violation, appellant would appreciate Officer Benham giving him, appellant, a chance to correct the situation before making an arrest.

Respondent asserts that during the meeting of Officer Benham and appellant, February 9th, that the typewritten letter did not come in contact with either of appellant's hands. A finger print expert found upon the letter the prints of a thumb and finger of appellant. The letter was not typed on the certain typewriter which belonged to appellant.

The State did not introduce in evidence the tape recording of the conversation between Officer Benham and appellant, although one officer testified that he had listened to it.

Respondent sought to establish the corpus delicti by attempting to show that appellant gave or offered the $50 to the law enforcement officer with felonious intent; but the evidence fails sufficiently to show either the offering or giving of the $50, or appellant's felonious intent, thereby to influence "such officer **to** receive or secure immunity from arrest, prosecution or punishment for a violation or contemplated violation of the liquor laws of the State of Idaho" (quoting from the information).

The evidence, not in conflict, showing such lack of proof, and particularly in relation to the dates, both February 8 and February 9, 1953, is illustrated by testimony elicited from the officers, respondent's witnesses, as follows:

The testimony of Officer Benham:

"Q. (By Pullos) * * * At that time (Feb. 8, 1953, at Blackfoot) * * * did I ask you to perform anything for me that was contrary to the way you had been performing it and contrary to the best rules of integrity of your office? A. No, sir.

"Q. At that time did I offer to give you fifty dollars? A. No, sir. * * *

"Q. Well, these places are licensed by the State, and if you walk in and see a violation or what you think may be a violation, what is your policy? What do you do? A. Well, there is times when we make arrests, or there might be times when we have seen fit to warn someone on some violation that he might be committing, to put him straight on it, and try to get him to cooperate with the law.

"Q. Well, what determines whether you make an arrest, or whether you don't. They are both violations, aren't they? A. Possibly, yes. It is kind of

hard to answer that question. All I can say is on that, so far as that particular part of it is concerned, there is some cases that might warrant an arrest, and there might be other cases where we could gain just as much by warning someone. * * *

"Q. You don't always arrest people when you see a violation; is that correct? A. That is correct.

"Q. And some times when you see a violation, you do warn them about it, and don't arrest them; is that correct? A. Yes, sir. * * *

"Q. Was it a general discussion, or was I asking you to do something for me? A. A general discussion, so far as I can recall it was to the extent that you told me how much trouble you had in the Phoenix Bar with the operation of it in regard to transient workers, and Negroes and Indians inhabiting the place and causing a lot of trouble. You also stated that you would appreciate it if I would walk in and tell you if you were in violation, rather than to arrest you. * * *

"Q. I didn't ask you not to arrest me for any violation? A. No; you did not.

"Q. Did you make the statement to me that you would treat me the same as anyone else? A. I did.

"Q. Then * * * I did not in any way attempt to influence (you) to allow me to violate any laws, or to give you any money, or ask you to do anything for me that you weren't doing for someone else? A. No, I wouldn't say that you did; no, sir. * * *

"Q. You had no reason to know that letter was from me * * *? A. Absolutely not. I didn't know who it was from, for sure. * * *

"Q. On February ninth then, Mr. Benham, I didn't give you fifty dollars, did I? A. No, sir; you did not.

"Q. I didn't offer you fifty dollars, did I? A. No, sir. * * *

"Q. * * * At Bidwell's on February ninth, I told you that if you entered the Phoenix and saw something that was wrong, or that was a violation, that instead of making an arrest I would appreciate if you would tell me about it and give me a chance to correct it? A. Yes.

"Q. And if it wasn't corrected, then you could do as you pleased. Is that a correct statement? A. Yes; I believe it is.

"Q. Then on February ninth, I never did ask you not to arrest me. * * * A. No.

"Q. Isn't this just exactly the way you told the jury a few minutes ago that you were performing your duties, that sometimes you see people violating the law, or you think it is a violation, and instead of arresting them you tell them about it? A. I believe I made a statement to that effect; yes. * * *

"Q. Well, in other words, exactly what I asked you to do was to give me the same treatment you were giving other people; is that right? Is that a true statement? A. * * * yes. * * *

"Q. Well, * * * the conversation said that if you wanted to catch someone real bad, for example, Lava or the Bannock, over a period of a year you could catch them, but I didn't tell you in outright words that instead of checking the Phoenix you can go check Lava and the Bannock Hotel? A. No, you didn't; no, sir.

"Q. Just summing it all up then, on February ninth * * * I did not offer you fifty dollars? A. You did not.

"Q. I did not give you fifty dollars? A. No, sir.

The Testimony of Officer Coley:

"Q. (by Pullos) * * * You did hear me say, 'If you see something wrong, or a violation, instead of making an arrest, tell me about it and I will correct it.' Is that correct? A. I believe that is right, Mr. Pullos.

"Q. That is a true statement; is that right? A. Yes, sir.

"Q. Did you hear me at any time say to Mr. Benham that I was violating the law, or had violated it in the past? A. No, sir.

"Q. Did you hear me say to Mr. Benham that I had any desire to violate the law in the future? A. No.

"Q. Did you hear me, or see me, give Mr. Benham fifty dollars? A. No, I didn't.

"Q. Did you hear me in any way tell Mr. Benham that he should treat me in any manner which he didn't treat anyone else,—that he give me special treatment, or anything like that? A. Not in so many words; no.

"Q. I didn't specifically request of Mr. Benham for him to stay away from the Phoenix, and instead of being there to be at the Bannock Hotel or at Lava, did I? A. No; you didn't tell him to, no. * * *

"Q. Did I tell him I was going to do anything wrong? A. No."

■ The evidence, even when viewed in the light most favorable to respondent, fails to show that the crime charged was committed.

■ It is a well-settled principle of criminal law that a conviction for crime cannot be had unless the *corpus delicti*, that is the fact that a crime has been actually perpetrated, is first established. State v. Sullivan, 34 Idaho 68, 199 P. 647, 17 A.L.R. 902; State v. McLennan, 40 Idaho 286, 231 P. 718; State v. Darrah, 60 Idaho 479, 92 P.2d 143; 20 Am.Jur. Evidence, sec. 1230, p. 1083; 23 C.J.S. Criminal Law, § 916, b, p. 182.

■ Before a legal conviction can be had the State must have established the accused's guilt of crime charged by legal

evidence beyond a reasonable doubt. State v. Seymour, 7 Idaho 257, 61 P. 1033; State v. Sullivan, 34 Idaho 68, 199 P. 647, 17 A.L.R. 902; State v. Copenbarger, 52 Idaho 441, 16 P.2d 383; State v. Rankin, 56 Idaho 64, 50 P.2d 3; State v. Varnes, 67 Idaho 183, 174 P.2d 200.

We deem it unnecessary to consider appellant's remaining assignments of error.

The judgment of the trial court is reversed with instructions to dismiss the information and discharge appellant.

TAYLOR, C. J., and KEETON, PORTER and ANDERSON, JJ., concur.