522 P.2d 64

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Paul G. HATTON, Defendant-Appellant.**

No. 10874.

Supreme Court of Idaho.

April 9, 1974.

Rehearing Denied May 29, 1974.

Derr, Derr, Walters & Cantrill, David Lee Posey, David W. Cantrill, Boise, for defendant-appellant.

W. Anthony Park, Atty. Gen., William F. Lee, Deputy Atty. Gen., Wayne G. Crookston, Asst. Atty. Gen., James E. Risch, Pros. Atty., for Ada County, Boise, for plaintiff-respondent.

DONALDSON, Justice.

This is an appeal by defendant-appellant Paul G. Hatton from a judgment of conviction of first degree murder, and from the order of the district court denying his motion for a new trial. Appellant's principal assignments of error relate to the admission of certain evidence at trial.

In the early morning hours of June 12, 1970, the Seven-Eleven store at the corner of Broadway and Rossi streets in Boise, Idaho, was robbed, and the clerk on duty at that time, Mark Charles Hatten (not related to the defendant) was shot in the back of the head. Hatten died following surgery, never having regained consciousness. The following distinctive features characterized the crime. The victim of the robbery-murder, Mark Charles Hatten, was found shortly after the crime had been committed, lying face down on the floor of a room off the main part of the store, with his hands at his sides. He had been shot in the back of the head at close range with a .22 caliber bullet. Hatten's wallet, which he always carried with him, was not on his body, and was never found, raising the inference that the perpetrator of the robbery had stolen it. The two cash registers in the store had been "cleaned out," the robber having taken most of the small change as well as the paper currency.

The crime is pinpointed as occurring between approximately 3:10 a. m. and 3:35 a. m., on the morning of June 12. These time limits were established by the testimony of Julius Carstensen, who stopped at the store on his way home from work, spoke with the victim, and left the store at 3:10 a. m., and the testimony of two other customers who entered the store around 3:35 a. m., realized that there had been a robbery, and called the police. There were no eye-witnesses to the crime, but Carstensen positively identified the appellant as having driven up to the store in a "dark-" or "dingy-" colored, older-model Volkswagen with glass-covered headlights and aluminum paint, and entering the store as Carstensen was leaving, at 3:10 a. m. When asked what he meant by a "dark color," Carstensen replied, "A blue or blue gray. It was a dark color. It is not real bright like yellow or red." On cross-examination, Carstensen reiterated the fact that the car was blue or blue-gray, and estimated the model year of the Volkswagen as being around 1963 or 1964. Carstensen also testified that the front of the store was well-lighted.

A police officer testified that during an interview sanctioned by Hatton's attorney, Hatton denied having been in the Seven-Eleven store the night of the murder, and first denied and then admitted knowing the victim, Mark Charles Hatten.

On the afternoon of June 12, appellant Hatton was arrested on a warrant charging him with the possession of stolen property not involved in the present case. On June 13, 1970, Hatton was charged with first degree murder arising from the Seven-Eleven robbery and shooting. Hatton pleaded not guilty to the charge. After trial, the jury returned a verdict of guilty of murder in the first degree. Judgment of conviction was entered on that verdict. The defendant was sentenced to imprisonment for a period not to exceed life.

On this appeal, appellant challenges the competency and relevance of certain testimony at trial concerning the actions of defendant's wife, Karen Hatton, in the early morning hours of June 13, 1970, beginning approximately ten hours after she visited

and spoke with her husband in jail. One of the state's witnesses, Craig Rooke, testified that Mrs. Hatton, whom he had not known previously, approached him at an "after hours" dance around 2:30 or 3 a. m. and attempted to persuade him to state that he had seen the Hattons at a movie on the night of June 11. No objection was made to Rooke's testimony about Karen Hatton's attempt to procure an alibi for the night of the 11th. Rooke also testified that at 4:30 a. m. on the morning of June 13, Mrs. Hatton appeared at Rooke's home, bringing with her a .22 caliber High Standard pistol and some ammunition wrapped in a ski parka. She asked Rooke to hide the articles, telling him that they were stolen property. Rooke immediately notified the police and turned the weapon, ammunition and parka over to the police officers who had had Karen Hatton under surveillance and had followed her to Rooke's house. Rooke's testimony was corroborated by his houseguest, the police officers who had been surveilling Karen Hatton, and by Mrs. Hatton herself, who explained her actions by saying that she believed the gun to be stolen property.

■ In our view, the testimony regarding Karen Hatton's actions was both relevant and competent as proof that the appellant had access to a weapon of the type used in the commission of the crime.

" ' [W]here an accused is identified as having been at or near the scene of a crime about the time of its commission evidence showing that he owned, possessed, or had access to any articles with which the crime was or might have been committed is competent.' " State v. Iddings, 5 Wash.App. 99, 485 P.2d 631, 633 (1971), quoting Liakas v. State, 161 Neb. 130, 72 N.W.2d 677 (1955), cert. denied, 351 U.S. 924, 76 S.Ct. 780, 100 L.Ed. 1454 (1956).

See also Jones v. United States, 262 F.2d 44 (4th Cir. 1958), cert. denied, 359 U.S. 972, 79 S.Ct. 887, 3 L.Ed.2d 839 (1959); State v. Hancock, 245 Or. 240, 421 P.2d 687 (1966); Wilson v. State, 215 Ga. 782, 113 S.E.2d 447 (1960); State v. Montgomery, 175 Kan. 176, 261 P.2d 1009 (1953).

■ Appellant Hatton has cited cases involving the attribution of the acts of one co-conspirator to another in support of his contention that testimony regarding Karen Hatton's actions should not have been admitted. These cases are not relevant here because there was never any contention that Karen Hatton was the defendant's co-conspirator. Authority from conspiracy cases is misleading rather than helpful. We understand appellant's basic contention to be that the disputed evidence was inadmissible as tending to prove Hatton's guilt by showing an attempt by a close associate to conceal evidence. Assuming that the disputed testimony was inadmissible for this purpose, the proper procedure would have been for appellant to have requested an instruction limiting the jury's use of the testimony. Where evidence is admissible for one purpose and inadmissible for another, the district court's failure to give a limiting instruction is not in itself reversible error where such an instruction is not requested. State v. Gee, 93 Idaho 636, 640, 470 P.2d 296 (1970); Wahlgreen v. State, 486 P.2d 753 (Okl.Cr.1971); Johnson v. People, 174 Colo. 413, 484 P.2d 110 (1971); Parish v. State, 477 P.2d 1005 (Alaska 1970); 23A C.J.S. Criminal Law § 1325(5), pp. 843–844 (1961). See also I.C. § 19–2132 as interpreted in State v. Beason, 95 Idaho 267, 275, 506 P.2d 1340, 1348 (1973); State v. Wozniak, 94 Idaho 312, 317, 486 P.2d 1025 (1971). Cf. I.C.R. 30 (effective January 1, 1972). In the instant case, the defense did not request an instruction limiting the use of the testimony regarding Karen Hatton's actions to proving that Hatton had access to the gun. We note additionally that although defendant objected to the introduction of testimony regarding Karen Hatton's actions prior to testimony on that subject by police officer McNichols, three other witnesses were subsequently permitted to testify without objection regarding her attempt to conceal the gun. Further, as part of the defend-

ant's case, Karen Hatton was called as a witness and substantially confirmed the description of her actions in taking the gun from the house belonging to herself and the defendant and attempting to convince Craig Rooke to conceal it. Previous Idaho cases have held that error, if any, in admitting certain testimony may be

> "waived and rendered harmless by [defendant's] failure to object when evidence covering the same subject matter was subsequently introduced and by [defendant's] latter [sic] corroboration, again without objection to such testimony." State v. Pruett, 91 Idaho 537, 541, 428 P.2d 43, 47 (1967), and cases cited therein.

Under the circumstances, we find no reversible error in the admission of the disputed testimony.

■ Over appellant's objection, the district court admitted the .22 caliber pistol into evidence. An expert witness from the Federal Bureau of Investigation testified that the pistol was capable of firing bullets of the type used in the murder. However, the expert testified that it was impossible to determine whether or not the bullet fragments removed from the victim's head had been fired from that particular pistol, because the bullet fragments were too distorted to reveal characteristic marks. Another F.B.I. expert testified that there were two small patches of human blood on the pistol. However, there was not enough of a sample to permit laboratory tests to determine the particular type of blood.

Appellant contends that the gun should not have been admitted in the absence of substantial evidence linking it to both the defendant and the crime. This contention is not persuasive.

> "There is no requirement that weapons * * * offered in evidence be positively identified as those used in the perpetration of a crime. The admission of such evidence is within the sound discretion of the trial court and any objection to the lack of positive identification goes to the weight of the evidence rather than

to the admissibility of the article." State v. Thomas, 94 Idaho 430, 433, 489 P.2d 1310, 1313 (1971).

*See also* State v. Rodriguez, 93 Idaho 286, 460 P.2d 711 (1969); Harris v. State, 450 P.2d 857 (Okl.Cr.1969).

■ ■ Appellant's next assignment of error is that the district court erred in allowing testimony regarding certain admissions by Hatton of uncharged prior crimes. By presenting evidence of said admissions, the state sought to establish the appellant's identity as the perpetrator of the Seven-Eleven robbery and murder by showing his past participation in other robberies with similar distinguishing features. Under certain circumstances evidence of prior crimes may be admissible when offered to prove the identity of the defendant as the perpetrator of the crime with which he is charged. State v. Shepherd, 94 Idaho 227, 230, 486 P.2d 82 (1971); State v. Johnson, 10 Or.App. 423, 500 P.2d 500, 502 (1972); Thessen v. State, 454 P.2d 341, 353 (Alaska 1969), cert. denied, 396 U.S. 1029, 90 S.Ct. 588, 24 L.Ed.2d 525 (1970). We have concluded that it was not error for the district court to admit the disputed testimony.

■ In accordance with the requirements of Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), the district court conducted a hearing out of the presence of the jury on the admissibility of Hatton's statements. As part of its offer of proof, the state presented testimony by Captain Eugene T. Lee, then of the Boise City Police, regarding the circumstances under which Hatton's admissions were made. Lee testified that at the preliminary hearing on the charge of first degree murder, Hatton asked Lee to come and see him. The preliminary hearing took place on July 29, 1970, but Lee was unable to visit Hatton until September 16, 1970, when he spoke with him in the jailer's office at the Ada County Jail. Captain Lee testified that he did not go to the jail to question the appellant, but to find out what Hatton wanted to talk to him

about. Detective Gifford accompanied Captain Lee.

Lee testified that after preliminary conversation, Hatton stated to him "I will plead guilty to second degree murder if I get a guarantee of fifteen years," but that he wanted "you guys to know that I didn't snuff out the kid." The district court correctly excluded testimony relating to that part of the conversation. As described by Lee, the conversation continued as follows:

"Q [Prosecuting Attorney] Officer, did you talk with him about some other robberies at that time?

"A I did.

"Q Did you make some statement to him about other robberies?

"A I made the statement to Paul, although he probably did not realize it, while pulling a series of robberies he had set a definite M.O.

"Q Did you explain it to him?

"A I told him his M.O. was different. We had never had anything like it before. He would make the victim lie face down on the floor, take the wallet from the victim, which is unusual. An armed robber in a supermarket is usually after the cash register and safe. We never had a question of this happen before. Another M.O. distinction was that he cleaned out all of the till entirely, Pennies, Nickels, and Dimes. Most armed robbers leave the small change behind.

"Q Did you indicate to him how many robberies you were talking about?

"A I accused him of seven.

"Q Did you ask any questions concerning these?

"A These were statements on my part explaining our evidence we had toward him.

"Q Did he volunteer any statement after that?

"A He said I only pulled three armed robberies in Boise.

"Q Did he indicate which ones?

"A He said the one way out on the end of Broadway, the first one which would be a Circle K way back in February. He said the second one was Albertson's, the one you nailed William Berg for, and then he stopped. He didn't mention the third one, and a few minutes later he mentioned a third one was an attempt to and that was on Buttreys manager. That was the one the burgler was actually caught at the time.

"Q Officer, were these statements that the Defendant made to you or were these in response to a question you put to him?

"A No, I didn't question him.

"Q These were statements made by you and voluntary answers made by him?

"A Yes, sir, that is right."

After hearing further testimony regarding the similarities between the Seven-Eleven robbery and three prior robberies, the district court allowed the testimony regarding Hatton's admissions.

The appellant first submits that evidence of Hatton's admissions should not have been allowed because of a lack of compliance with the requirements of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966). In Miranda, the United States Supreme Court stated:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444, 86 S. Ct. at 1612. (Emphasis added.)

The state concedes that Captain Lee did not advise Hatton of his Miranda rights before or during their conversation, al-

though the record shows that Hatton had been advised of his rights at least four, and possibly as many as five times during the period since his arrest on June 12, 1970. Hatton was represented by counsel at the time when the conversation took place, but counsel was not notified or present.

The pre-*Miranda* case of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) held inadmissible certain statements obtained by subterfuge from an indicted defendant because the use of trickery in obtaining such statements deprived the defendant of his right to counsel. Shortly after *Massiah*, the case of Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) held inadmissible statements made by an in-custody defendant before indictment who had asked to speak with his attorney, but was prevented from doing so by his questioners. By relying on *Massiah* and *Escobedo,* some defendants have demanded exclusion of all statements made in the absence of counsel after such counsel has been appointed, regardless of the circumstances under which such statements were made. We concur with the majority of courts which have rejected this view. United States v. DeLoy, 421 F.2d 900 (5th Cir. 1970) ; United States v. Dowells, 415 F.2d 801 (9th Cir. 1969) ; Reinke v. United States, 405 F.2d 228 (9th Cir. 1968) ; Coughlan v. United States, 391 F.2d 371 (9th Cir. 1968) ; Massie v. Commonwealth, 348 F.Supp. 160 (W.D.Va.1972) ; State v. Chabonian, 50 Wis.2d 574, 185 N.W.2d 289 (1971) ; State v. Lopez, 80 N.M. 130, 452 P.2d 199 (1969) ; State v. Beaver, 248 Or. 101, 432 P.2d 509 (1967). *See also* State v. Ortega, 95 Idaho 239, 506 P.2d 466 (1973).

In the instant case, the appellant requested and initiated the interview with Captain Lee. While he was not advised of his rights on that occasion, the record indicates that he had been given *Miranda* warnings on several prior occasions and understood them. The record also shows that he had consulted with his attorney on prior occasions. In the *Miranda* case itself, the Supreme Court stated:

"In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. *Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.*" 384 U.S. at 478, 86 S.Ct. at 1630. (Emphasis added.)

A case in point, with circumstances closely resembling those of the instant case, is that of State v. Bryson, 22 Ohio St.2d 224, 259 N.E.2d 740 (1970), modified as to sentence imposed, 408 U.S. 938, 92 S.Ct. 2867, 33 L.Ed.2d 757 (1972). In that case, Bryson was taken into custody on September 7, 1966, on a charge of murder. On October 28, 1966, he requested an interview with Officer Guffy who had been working on the case. Guffy took Officer Parker with him. As described by Officer Guffy the pertinent part of the conversation with Bryson went as follows:

" 'He said "I know of some B. and E's [breaking and entering] that they have pulled," and he said "I am going to have some company up here." I said "How do you know that they pulled some B. and E's? and he said, "Because I was with them on some of these B. and E's," and I said "Which B. and E. was you involved with and who was with you?" and he said, "I will tell you later on."

He said, "I won't tell you now," but he said, "I will have some company up here with me." At this time he had calmed down a little bit and he said to me, he said, "Have you been working hard?" and I said "Yes, you know I have," and he said, *"I have had you working pretty hard on trying to find the boy that I told you that I was with on the robbery at the Dixie Inn,"* and he said, *"I will tell you right now,"* he said, *"This boy wasn't with me. I was by myself."* ' (Emphasis supplied.)" 259 N.E.2d at 742.

The Ohio Supreme Court held that Bryson's statements were properly admitted at trial. That court stated:

"Immediately prior to this conversation with the police, Bryson was not advised of his constitutional rights, although previously, when interrogated by the police, he had been so advised.

\*     \*     \*     \*     \*     \*

"[*Miranda*] compels the protection of a suspect faced with the coercion inherent in police interrogation against pressures which break down the suspect's will to resist and threaten the Fifth Amendment privilege against self-incrimination. \* \* \* Such pressures were absent in this case. The atmosphere surrounding Guffy and the defendant was neither coercive nor intimidating. Guffy did not force his will upon Bryson. He did not ask coercive questions calculated to compel Bryson to answer. At most, Guffy merely sought clarification or explanation of the information willingly supplied by the defendant. In no sense can the conversation be characterized as an 'in-custody interrogation.' " 259 N.E.2d at 742.

For other cases where, under similar facts, the volunteered statements of an in-custody defendant made during a conversation with a law enforcement official have been held admissible, in spite of the absence of *Miranda* warnings at that specific time, *see* United States v. Trosper, 450 F.2d 319 (5th Cir. 1971); United States v. Powers, 444 F.2d 260 (5th Cir. 1971); Massie v. Commonwealth, *supra*; Cook v. Cox, 330 F.Supp. 1323 (W.D.Va.1971); People v. Tomita, 260 Cal.App.2d 88, 66 Cal.Rptr. 739 (1968). *See also* State v. Gonzales, 92 Idaho 152, 438 P.2d 897 (1968); United States v. Tucker, 409 F.2d 223 (4th Cir. 1969); State v. Chabonian, *supra*.

■ We hold that in the instant case, where Hatton asked to talk to Captain Lee, volunteered the information about his participation in the other robberies in an atmosphere free of coercion, and had been given *Miranda* warnings on several prior occasions, it was not error to admit evidence of his admissions at trial.

The appellant next contends that the three uncharged robberies in which Hatton admitted participating were not sufficiently similar to the Seven-Eleven robbery-murder to be relevant on the issue of Hatton's identity as the perpetrator of the crime.

■ While evidence of other unrelated crimes is inadmissible to show criminal propensity on the part of the accused, evidence of other crimes is admissible when relevant to prove

"(1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other, (5) *the identity of the person charged with the commission of the crime on trial,* and (6) other similar issues." State v. Shepherd, 94 Idaho 227, 230, 486 P.2d 82, 85 (1971). (Emphasis added).

Evidence of other crimes committed by the defendant is relevant to the issue of identity if it discloses a distinctive *modus operandi* common to the other crimes and the crime with which the defendant is charged. State v. Johnson, *supra*, 500 P.2d at 502; Thessen v. State, *supra*, 454 P.2d at 353; People v. Haston, 69 Cal.2d 233, 70 Cal. Rptr. 419, 426–427, 444 P.2d 91, 98–99 (1968).

In the instant case, Hatton admitted participating in the robbery of a Circle K food store, an Albertson's supermarket and an attempted kidnapping and robbery of the manager of a Buttrey's supermarket. Apparently all three crimes occurred in 1970.

The robbery of the Circle K store had the following features in common with the Seven-Eleven robbery. Both were armed robberies of "convenience" stores in Boise. In both cases, the victim of the robbery was forced to lie face down on the floor with his hands at his sides. In both cases, the robber or robbers took all of the cash register money, coins as well as currency. Captain Lee testified that the features of forcing the victim to lie down on the floor and taking small change as well as paper money were very unusual in Boise.

The robbery of the Albertson's market had the following features in common with the Seven-Eleven robbery. Both were armed robberies involving the use of a pistol. In both cases the victims were forced to lie face down on the floor with their hands at their sides. In both cases, the victims' wallets were stolen. Captain Lee testified that it was "very unusual, very distinctive" in the Boise area for an armed robber of a store to take the clerk's wallet. He stated that usually "in commercial armed robberies [the robbers] are after the safe and cash register. They are not interested in the poor clerk's personal wallet."

There was sufficient similarity between the Circle K and Albertson's robberies and the Seven-Eleven robbery to make evidence regarding the earlier robberies relevant on the issue of identity. The fact that neither the Circle K nor the Albertson's robbery was completely unique or novel does not bar the evidence. *Cf.* State v. Johnson, supra, 500 P.2d at 502.

We agree with appellant that the alleged circumstances of the attempted kidnapping and robbery involving the manager of a Buttrey's store were too different from the circumstances of the crime for which appellant was being tried to be relevant on the issue of identity. However, the erroneous admission of testimony concerning the Buttrey's robbery does not constitute reversible error. As a whole, the testimony regarding the prior robberies in which Hatton admitted participating represented only a small part of the evidence presented at trial. The district court properly instructed the jury on the limited use they could make of the evidence of prior crimes. In State v. Tisdel, 94 Idaho 329, 332, 487 P.2d 692, 695 (1971), this Court held that judgment of conviction will not be reversed on the ground of erroneous admission of evidence of a prior crime

> "where the evidence of defendant's guilt is satisfactory and is such as ordinarily produces moral certainty or conviction in an unprejudiced mind, and the result would not have been different had an error in the trial not been committed * * *."

*See also* State v. Gilbert, 65 Idaho 210, 219, 142 P.2d 584 (1943). We are convinced that exclusion of the evidence regarding the attempted Buttrey's robbery would have made no difference in the jury's verdict, and therefor the error in admitting it was harmless.

Appellant also claims the trial court erred in admitting evidence concerning a Volkswagen auto because the evidence was irrelevant to any issue in the case. Julius Carstensen, the witness who identified the defendant as the man he had seen entering the Seven-Eleven store shortly before the crime was committed, testified that the defendant had driven up to the store in a blue-gray, older-model (1963 or 1964) Volkswagen with glass-covered headlights and aluminum paint. Mrs. Richard Nichols, the appellant's next-door neighbor, testified that she and her husband owned a 1963 Volkswagen which had been left parked on the street near appellant's apartment during the week in which the crime took place, while she and her husband were away on vacation. Also, Police Officer Bacus testified that the Nichols' Volkswa-

gen had been broken into, that it was very simple to "hot-wire" Volkswagens of that model and that there was some evidence that the Nichols' car had been hot-wired. The Hatton and Nichols residences were a short distance from each other and the Seven-Eleven store where the crime took place.

During the testimony regarding the Nichols' car, the defendant successfully objected to the introduction of pictures of the automobile. However, for the first time on this appeal the appellant objects to the introduction of *any* testimony regarding Mrs. Nichols' car on the ground the information about the car was too remote to be relevant and probative. It is our opinion that the testimony regarding the car was relevant and admissible because the defendant was seen at the scene of the crime shortly before it was committed in a Volkswagen of a description and year corresponding to the Nichols' car. Furthermore, this Court will not review the admissibility of testimony when the objections to the evidence were raised for the first time on appeal. State v. Wozniak, 94 Idaho 312, 320, 486 P.2d 1025 (1971); State v. Linn, 93 Idaho 430, 435, 462 P.2d 729 (1969).

Over appellant's objection, the district court allowed the state to introduce certain color photographs of the head of the deceased victim which were taken during the autopsy. (State's exhibits six, eight and nine.) The appellant argues that it was error to admit the photographs on the ground that they were not relevant to any disputed issue in the case and could only serve to inflame the jury. Another photograph (State's exhibit five), which depicted the floor of the store where the victim was found, was objected to at trial, but its admissibility is not argued on this appeal.

"The general rule is that photographs of the victim in a prosecution for homicide, duly verified and shown by extrinsic evidence to be faithful representations of the victim at the time in ques-

tion are, in the discretion of the trial court, admissible in evidence as an aid to the jury in arriving at a fair understanding of the evidence, proof of the *corpus delicti*, extent of injury, condition and identification of the body, or for their bearing on the question of the degree or atrociousness of the crime, even though such photographs may have the additional effect of tending to excite the emotions of the jury." State v. Martinez, 92 Idaho 183, 188, 439 P.2d 691, 696 (1968).

In this case, the appellant conceded that there had been a killing, that the killing had taken place during an armed robbery, and that the cause of death was from a gunshot wound in the back of the head. Therefore, appellant argues, the photographs were not probative of any disputed issue in the case and were irrelevant and inadmissible.

"It is a well-settled principle of criminal law that a conviction for crime cannot be had unless the *corpus delicti*, that is the fact that a crime has been actually perpetrated, is first established." State v. Pullos, 76 Idaho 369, 373, 283 P.2d 590, 593 (1955).

It is the duty of the state to prove all elements of the crime charged, even where the defendant concedes the fact and cause of death. State v. Campbell, 210 Kan. 265, 500 P.2d 21, 30 (1972); State v. Adams, 76 Wash.2d 650, 458 P.2d 558, 566 (1969), rev'd on other grounds, 403 U.S. 947, 91 S.Ct. 2273, 29 L.Ed.2d 855 (1971).

Pursuant to its obligation to prove *corpus delicti*, the state called Dr. Helen Beeman, a qualified pathologist, who had performed the autopsy of the deceased. Her testimony concerned the nature of the injury, the path of the bullet, and the cause of death. She testified that the photographs could contribute to illustrating her testimony. Autopsy photographs have been found relevant where used to illustrate or explain the testimony of doctors testifying as expert witnesses. State v. Beason, *supra*, 95 Idaho at 278, 506 P.2d at 1351; State v. Campbell, *supra*, 500 P.2d at 30;

People v. Robles, 2 Cal.3d 205, 85 Cal.Rptr. 166, 172, 466 P.2d 710, 716 (1970); State v. Adams, *supra,* 458 P.2d at 562.

The balancing of the relevance of photographic evidence against its possible prejudicial or inflammatory effect rests primarily in the sound discretion of the trial court. State v. Beason, *supra,* 95 Idaho at 278, 506 P.2d at 1351; Armstrong v. State, 502 P.2d 440, 448 (Alaska 1972); State v. Webb, 81 N.M. 508, 469 P.2d 153, 155 (1970). As we pointed out in State v. Beason, *supra,* 95 Idaho at 279, 506 P.2d at 1352:

> "The trial court was in a far better position to determine whether the probative value was insufficient to overcome any possible inflammatory effect on the jury."

We do not consider the admission of the autopsy photographs to have been an abuse of the district court's discretion.

▮ Appellant raises three other matters which, he contends, illustrate that he did not receive a fair trial. During the voir dire examination, the district court asked the following two questions of a prospective juror who had indicated that he was irrevocably opposed to the death penalty.

> "THE COURT: I would like to inquire of Mr. Long. Mr. Long, would your position be the same no matter what kind of evidence you heard in the case as to the death penalty?
>
> \*   \*   \*   \*   \*   \*
>
> "Would that be true no matter how terrible the offense was?"

The appellant contends that these two questions prejudiced the jury against him by indicating that the district court considered the offense to be one deserving the imposition of the death penalty. In our opinion, the district court's questions were not prejudicial. United States v. Puff, 211 F.2d 171, 180–181 (2d Cir. 1954); State v. Westbrook, 99 Ariz. 30, 406 P.2d 388, 392–393 (1965), vacated on other grounds, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966). Furthermore, the district court instructed the jury to disregard any of its statements or questions which suggested an opinion or belief.

▮ Appellant states that when he wished to call Detectives Brake and Horton as witnesses in his behalf, they could not be located. Brake and Horton had both previously testified for the state. The appellant informs us that "rather than delay the trial until the witnesses could be found," he "decided not to call them." The record does not reveal an objection to their absence before the district court; appellant did not request a recess while he attempted to locate the officers. It is too late to complain of their absence on this appeal.

▮ Toward the end of the trial, counsel for the appellant notified the district court that he had seen some of the witnesses having lunch together and that some of the police witnesses were talking together at lunch. They had been previously instructed not to discuss the case with each other. Defense counsel did not know what they were talking about, nor did he request at that time that the district court again admonish the witnesses not to discuss the case among themselves. Absent any showing of the subject of the conversation, we conclude that the contact among the witnesses was harmless. *Cf.* State v. Rodriguez, *supra.*

We have reviewed the appellant's other assignments of error and have found them to be without merit. Accordingly, the judgment of conviction is affirmed.

SHEPARD, C. J., and McQUADE, McFADDEN and BAKES, JJ., concur.