616 P.2d 1034

The STATE of Idaho,
Plaintiff–Respondent,

v.

Charles SHARP, Defendant–Appellant.

No. 12376.

Supreme Court of Idaho.

Sept. 3, 1980.

Klaus Wiebe, Ada County Public Defender, and John C. Lynn, Boise, for defendant–appellant.

David H. Leroy, Atty. Gen., Arthur J. Berry, Deputy Atty. Gen., and Ronald D. Howen, Sp. Asst. Atty. Gen., Boise, for plaintiff–respondent.

SHEPARD, Justice.

This is an appeal from a conviction of robbery following trial and a jury verdict of guilty. We affirm.

Defendant–appellant Charles Sharp was charged with the crime of robbery in Ada County, Idaho, on August 26, 1975. He pled not guilty and was tried before a jury in June of 1976. The jury returned a guilty verdict and Sharp was sentenced to a term of not to exceed twenty–five years. This appeal resulted and oral argument was had thereon on the 21st day of February, 1979.

The case was reassigned to this writer August 12, 1980.

Between 8:30 and 9:00 on the morning of the robbery, Sharp appeared at the job site of his step–brother, Fred Boyce. That job site was approximately three miles from the scene of the robbery, i. e., a Circle K convenience store located in Ada County, Idaho. Sharp was riding a motorcycle and wore levi's, a light brown jacket, and a red helmet. Sharp told Boyce he was broke and received a twenty dollar loan. He left the job site shortly after 9:00 a. m.

The Circle K store was entered by the robber between 9:00 and 9:30 a. m. He was described as wearing a light brown jacket, having long light brown hair, a full mustache and carrying a bright orange–red motorcycle helmet. Aside from an employee's vehicle, a motorcycle was the only vehicle parked in front of the store.

The robber ordered a sandwich and then pointed a handgun at the employee (Mrs. Eberhart) and demanded money. She could only describe the weapon as dark brown or black with a long dark barrel. She gave him the money in a plain brown paper bag. She was then forced into a back room where she was struck from behind with a blunt object and then struck a second time over the head with an empty pop bottle.

Later that day, the police included a picture of Sharp in a group shown Mrs. Eberhart, but she did not select Sharp's picture as the robber. At the preliminary hearing, although Sharp was seated next to his counsel, when Mrs. Eberhart was asked to identify her assailant, she pointed to one James Beatty, who was sitting in back of the courtroom. Beatty was called by defense counsel and questioned about his knowledge of the robbery, but he apparently was merely a by–stander awaiting the trial of a friend. Although subpoenaed by both the prosecution and the defense, he could not be located at the time of trial. At trial, Mrs. Eberhart again failed to identify her assailant. There was, however, testimony from three witnesses that the defendant had changed his appearance substantially since

the time of the robbery and at the date of the robbery, he would have more clearly fit the description given by Mrs. Eberhart.

On the evening of the robbery, Sharp went to the home of his step–sister, Vonda Dudley and asked that he be allowed to spend the night. Dudley testified that Sharp brought with him a brown paper bag containing a pistol and asked her to dispose of it. He stated that he was on parole and would be in trouble if he were caught with it. Dudley testified that she threw the gun into the Boise River. A black and/or brown automatic pistol was recovered by the police about twenty feet from where Dudley had thrown the gun. The gun recovered from the river belonged to one Vance Fleming, who testified that the gun had disappeared shortly after Sharp had been in Fleming's apartment. Dudley insisted in her testimony that the gun recovered from the river was not the one she had thrown into the river. The gun could not be identified positively as the robbery weapon.

The evidence indicated that the shattered pop bottle, while containing blood of the victim, had only one clear fingerprint which was not that of Sharp. The neck of the bottle, however, could not be found and Sharp's brother testified that Sharp had told him that he had touched only the top part of the bottle and had disposed of that portion.

Both the sister and brother of Sharp testified that on the evening of the robbery day, Sharp had stated that he committed the robbery. They testified, however, that it was said in a joking way and that when asked about the pistol whipping of Mrs. Eberhart, which was apparently mentioned on a news broadcast, Sharp retracted his admission. Both witnesses claimed that the police had threatened them with being charged as accessories, indicated that Sharp's fingerprints had been found at the scene and warned that since they were both ex–felons they could lose custody of their children.

Sharp was apprehended in Oregon after initially trying to evade officers and when apprehended claimed to be his step–brother.

At this point, we note that while the evidence adduced at trial was largely circumstantial, the chain of evidence strongly pointed to the guilt of Sharp. We further note that the State's evidence also included items which were not of assistance to the State's case, i. e., a fingerprint on the remnant of the pop bottle which was not Sharp's, blood on the jacket recovered from Sharp was not human, but bovine, the lack of Sharp's fingerprints at other places, such as the telephone which had been torn loose by the robber, and the lack of any fingerprints on the weapon recovered from the river.

I.

■ Appellant asserts error in Jury Instruction No. 3, which he argues violated his right to a presumption of innocence. That instruction included a verbatim reading of the information containing the following language:

"Charles Sharp is accused by this Information of the crime of Robbery, I.C. 18–6501, felony upon which charge the said Charles Sharp having been duly brought before a Magistrate on the 4th day of November, 1975, and *having had his preliminary examination thereon upon said charge, by said Magistrate thereupon held to answer to the District Court of the Fourth Judicial District of the State of Idaho* . . ." (Emphasis added.)

Defense counsel moved to excise the above italicized language, arguing that such language could give a jury the impression that a magistrate had already found him guilty of the crime charged, thus violating his right to due process under the Fifth and Fourteenth Amendments of the United States Constitution. That motion was denied and the argument is reiterated here. We do not agree with appellant's contention.

I.C. § 19–2101 provides in pertinent part:

"Order of trial.–The jury having been impaneled and sworn, the trial must proceed in the following order:

"1. If the indictment is for a felony, the clerk must read it and state the plea of the defendant to the jury. In all other cases this formality may be dispensed with."

Failure to read the indictment or information and to state the plea of the defendant has been held to be reversible error. *State v. Cronk*, 78 Idaho 585, 307 P.2d 1113 (1957); *State v. Chambers*, 9 Idaho 673, 75 P. 274 (1904). Appellant cites no pertinent authority in support of his argument. We deem the case at bar to present circumstances far removed from those of *State v. Wiggins*, 96 Idaho 766, 536 P.2d 1116 (1975), and *State v. Johnson*, 86 Idaho 51, 383 P.2d 326 (1963). Those cases were concerned with a repeat or habitual offender charge and only prohibited informing the jury of that portion of the information which referred to previous convictions of the defendant.

Instruction No. 16 particularly cautioned the jury:

"The function of the jury is to determine the issues of fact that are presented by the allegations in the information filed in this court and the defendant's plea of 'not guilty.' This duty you should perform uninfluenced by pity for a defendant or by passion or prejudice against him. You must not suffer yourself to be biased against a defendant *because of the fact that he has been arrested for this offense, or because an information has been filed against him or because he has been brought before the court to stand trial.* None of these factors is evidence of his guilt, and you are not permitted to infer or to speculate from any or all of them that he is more likely to be guilty than innocent."

Thus, we hold appellant's assertion of error to be without merit. In a related argument, appellant asserts that the trial court erred in admitting the testimony of Fleming which related the circumstances of Sharp's visit to Fleming's apartment. Sharp argues that such testimony was highly prejudicial and erroneous in that it unnecessarily placed before the jury evidence

of another unrelated crime allegedly committed by Sharp. While we agree as to the prejudice against Sharp, we do not agree that its admissibility by the trial court was erroneous. Here, the court was not faced with a situation as in *State v. Shepherd*, 94 Idaho 227, 486 P.2d 82 (1971), wherein the defendant took the stand and was asked upon cross–examination whether he had previously been convicted of a felony and upon his affirmative answer, further inquiry was made as to what particular felony. Rather, the instant case is more similar to that of *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107 (1975), wherein the evidence of the commission of the crime charged also included evidence of the commission of uncharged crimes. The Court said in *Izatt*:

"But we do not agree that the introduction of the evidence here in question does not fall within an exception concerning introduction of evidence of other crimes regardless of whether this exception fits neatly into one of the categories we listed in *Shepherd*. As was well stated in the Colorado Supreme Court in *Monge v. People*, '[all] facts inseparably connected to the chain of events of which the act charged in the information is a part are admissible even though the full story shows the commission of other crimes,' *Monge v. People*, 158 Colo. 224, 406 P.2d 674, at 678 (1965)."

*See State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Hatton*, 95 Idaho 856, 522 P.2d 64 (1974).

■ Here, although Fleming's testimony included his conclusion that Sharp had stolen the weapon from his apartment, such evidence constituted "facts inseparably connected to the chain of events" in that it placed Sharp as having access to *the* weapon which was recovered from the Boise River at a spot close to where Dudley threw a weapon given her by Sharp. Although Dudley denied that the recovered weapon was the one she had thrown into the river, Fleming identified the recovered weapon as belonging to him and by his testimony provided the link placing it in the hands of Sharp. The probative value of the evidence

linking the defendant to the commission of the crime is to be weighed against the prejudice to the defendant and the inclusion or exclusion of such evidence is a matter for the exercise of the sound discretion of the trial court. *State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971). Here, we find no abuse of that discretion.

## II.

Appellant next asserts, "It is offensive to the Confrontation Clause of the United States Constitution to present prior testimony of a declarant who is not present and available for cross–examination." Such assertion relates to the use of the preliminary hearing testimony of James Beatty. Beatty was the person whom Mrs. Eberhart had, at the preliminary hearing, identified as her assailant. Thereafter, at the preliminary hearing, Beatty had been called as a witness by the defense. His testimony was exceedingly brief and indicated he was only in the courtroom as a bystander and, while he had been identified as the robber, he had not committed the robbery. At trial, both the defense and the prosecution had subpoenaed Beatty, however, he could not be located. At trial, defense counsel had stipulated that to avoid delay, the prosecution could call Beatty upon a reopening of the prosecution's case. Following the closing of the defense case, the prosecution was still unable to locate Beatty and proposed that his preliminary hearing testimony be read. Over defense objection, that procedure was allowed.

Sharp argues that such procedure was offensive to the Confrontation Clause of the United States Constitution. We disagree. Such argument was disposed of by the recent case of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). The instant case is similar to *Roberts*, in that Beatty was called as a defense witness and his testimony bears adequate "indicia of reliability" and he was unavailable as a witness in the constitutional sense since "the prosecutorial authorities have made a *good-faith* effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, at

724–25, 88 S.Ct. 1318, 1322, 20 L.Ed.2d 255 (1968).

Even though Beatty was identified by Eberhart at the preliminary hearing as the robber and was questioned as to his participation, there was never any serious contention that he committed the crime. Defense counsel, in his closing argument, stated: "I don't think Jim Beatty committed this crime. I mean, he might have, but I don't think he did. It would be a long shot." We believe the record clearly establishes that the sole purpose of reference to Beatty or his testimony was to impeach the testimony of Mrs. Eberhart. The defense's cross-examination of Mrs. Eberhart reveals reference to her identification of Beatty as the robber.

Although Sharp makes reference to *State v. Villarreal*, 94 Idaho 246, 486 P.2d 257 (1971), and *State v. Potter*, 6 Idaho 584, 57 P. 431 (1899), such cases are not controlling as to the confrontation clause of the United States Constitution in light of *Ohio v. Roberts, supra*. Further, as noted in those cases, Idaho's Constitution does not contain a Confrontation Clause equivalent to that of the United States Constitution. *Potter* and *Villarreal* were decided on state grounds of policy rather than confrontation clause grounds. We believe the policies deemed to be served by *Potter* and *Villarreal* are not present in the instant case in view of the defense advancement of Beatty as a witness at the preliminary hearing. Further, we find no possibility of prejudice resulting to Sharp from the presentation of Beatty's preliminary hearing testimony. Since the question of possible prejudice does not arise in a United States Constitution context, we need not apply the rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## III.

We turn now to appellant's assertion that the prosecuting attorney's remarks contained in his closing argument constituted error of such magnitude in their prejudicial effect as to be misconduct requiring a reversal of the conviction. We disagree.

We initially note that defense counsel entered no objection to those remarks either during or on completion of the prosecutor's closing argument. No request was made for a cautionary instruction regarding the proper focus as to the accused's guilt or innocence as contrasted with the prosecutor's personal integrity. Closing arguments were made on June 18, 1976, and the guilty verdict was returned that same day. The comments in question were not alleged to be prejudicial until a week later at the time of the motion for a new trial.

▇ The general rule in Idaho is that in the absence of a timely objection to an alleged error at trial, an appellate court will not consider the alleged error on appeal. *State v. Gishe,* 87 Idaho 341, 393 P.2d 342 (1964); *State v. Spencer,* 74 Idaho 173, 258 P.2d 1147 (1953); *State v. Boyatt,* 59 Idaho 77, 87 P.2d 992 (1939). *Spencer* did hold that the failure to object to the closing arguments of a prosecuting attorney in a criminal case *may* not constitute a waiver of the objection. The *Spencer* exception to the general rule, however, contains limiting language. In *Spencer,* it was held that error will be preserved despite defendant's failure to object "where the record shows that the prosecuting attorney has been guilty of misconduct calculated to inflame the minds of jurors and arouse prejudice or passion against the accused by statements in his argument of facts not proved by evidence . . . ." The rationale of *Spencer* was that a timely objection would not have cured the inherently prejudicial comments.

The prejudicial comments in *Spencer* included: (1) the repeated reference to a gruesome, unrelated crime which had been committed in the same county shortly before the shooting in question in which a young boy's body was found with a slit throat; (2) the reference to the unrelated killing of five persons also in the same county on the night preceding the beginning of the *Spencer* trial; (3) the statement that the jurors would have to "run the gauntlet of your friends when you get to the street if you free the defendant"; (4)

the misstatement of certain evidence clearly disclosed by the record; and (5) the lengthy discussion of the contents of the cabin and the motive of the shooting, all of which was based on previously excluded evidence. It was held that those references to the unrelated murders could only have been calculated to inflame the minds of the jurors and arouse prejudice against the defendant while the remaining statements encouraged the jury to convict the accused on the basis of factors which were either clearly outside of or inconsistent with the record.

In the case at bar, the closing argument comments by the prosecutor relate to defense accusations of a "frame-up" of Sharp by the police and the prosecution and the injection of the personal integrity of the prosecutor. The prosecutor did not state any personal belief in or knowledge of defendant's guilt. The purpose of the remarks was apparently to emphasize the lack of credibility of any claim of "frame-up." It was evidently in that context that the prosecutor spoke excessively regarding his own personal integrity. Nevertheless, we do not believe that his comments were so inherently prejudicial that a timely objection, accompanied by an instruction by the court to disregard the comments, would not have cured the defect.

Assuming *arguendo* that appellants' failure to object to the comments made by the State during closing argument does not foreclose appellate review, we proceed to consider the propriety of the remarks of which appellant complains. Those remarks include:

"MR. HOWEN: [after defense closing argument] Ladies and gentleman, Mr. Matthews has accused me at various times of having interjected myself personally in this case. He is incensed about this. Well, he is incensed about Paul Phelps and what we did with the evidence. He is, I guess, also personally involved as far as his comments are how the officers have performed in this case.

"Let's take a look at this. Let's make no bones about it. *I am incensed at the accusations* that have been made by two

witnesses that have testified in this case *that this is a frame*. You have heard the testimony and perhaps Mr. Matthews doesn't recall it, but I was the one that gave the authority for the arrest and it was subsequent to the obtaining of the initial statement that was given to Lance Anderson.

"I have handled the preliminary hearing and I have prepared this case. There is no way around that. *It does incense me that people will come in here and accuse the Prosecution of a frame job.*"

■ Every person accused of crime in Idaho has the right to a fair and impartial trial. The court recognizes the duty of a prosecutor to see that the accused receives a fair trial. *State v. Wilbanks*, 95 Idaho 346, 509 P.2d 331 (1973); *State v. Spencer, supra*. At the same time, we have consistently pointed out that counsel for both sides have traditionally been afforded considerable latitude in their arguments to the jury and have the right to discuss fully, from *their respective standpoints*, the evidence and the inferences arising therefrom. *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978); *State v. Sistrunk*, 98 Idaho 629, 570 P.2d 866 (1977); *State v. Gilbert*, 65 Idaho 210, 142 P.2d 584 (1943).

In *Sistrunk*, we recently addressed the question of the latitude afforded a prosecutor in his closing argument. There appellant had been convicted of acting as an accomplice to a burglary and larceny. The attorney for a second defendant had introduced in evidence the fact that the principal had pleaded guilty to the larceny charge and argued to the jury that it was unfair to pursue the burglary charge against the accomplices. Appellant's attorney argued to the jury that the principal alone was guilty since he had pleaded guilty to the offense. In closing argument, the prosecutor stated:

"It's a mere legal maneuver, mere tactical maneuver on the counsel's part in hopes that perhaps of getting him off on a misdemeanor and he won't be convicted of the felony . . . I submit to you, ladies and gentlemen, it's a mere sympathy pitch to avoid prosecution for which

each one of these three defendants wishes to avoid, and that's the possible penitentiary sentence on the felony."

In *Sistrunk*, this Court held that the challenged remarks were not erroneous and we specifically noted that the issue was injected in the case by the defendants, thereby inviting responsive comment by the prosecuting attorney. Quoting *State v. Jaramillo*, 110 Ariz. 481, 520 P.2d 1105, at 1107 (1974), we stated:

"Remarks of a prosecuting attorney, even if improper, are not grounds for reversal if invited or occasioned by opposing counsel unless the prosecutor's remarks go beyond a pertinent reply or are necessarily prejudicial." 98 Idaho at 631, 570 P.2d at 1107.

The State argues that those remarks of the prosecutor complained of by the appellant were only responsive to the contentions of the defendant-appellant that he was the subject of a "frame job" and that such comments by the prosecutor were justified in the context in which they were made. The record indicates the contentions by the defense that the police were out to "get him" and that the prosecution was conducted not because of the evidence but in spite of it.

Evidently, the opening statements of counsel were not recorded and in any event are not part of the record here. The State argues that the content of the opening statement by defense counsel is revealed in a colloquy between the court and the attorneys outside the presence of the jury during the State's direct examination of the defendant's sister, Vonda Dudley. In response to the challenged relevancy of his question, the prosecutor stated:

"Secondarily, I also note that counsel indicated by the opening statement he intends to prove that these statements were coerced, and I intend to show the opposite, at least, in my case in chief . . .

"There is also another factor involved in this, Judge. I anticipate there is going to be accusations towards the officers as Mr. Matthews' opening statement, that

this is a set up deal. I intend to show by the nature of the officer's actions what evidence came before them in this case, to show that this was not a set up deal by any of the officers or in any way connected. This was not just a 'let's go pick Charley Sharp up and we will fix a case up around him.'"

Upon the cross-examination of Officer Clough, defense counsel propounded a series of questions clearly designed to imply to the jury that Sharp had been targeted as the suspect and that the fingerprints obtained by the police were never submitted to the FBI for comparison with the fingerprints of any other persons, but rather the fingerprints were only compared with those of Sharp.

"Q  I don't want you to mention the name of the individual, but at the time you filled out this lab request, did you specifically ask the lab to compare the prints in question with the known prints of a particular person?

"A  Yes, I did.

. . . . .

"Q  And the F.B.I. keeps a master bank of the millions of fingerprints sent into them; is that right?

"A  That is correct.

"Q  And on numerous occasions when prints are found, they are sent to the F.B.I. to compare with these millions of prints to see if they can pick out whose prints they are *if you don't have a known suspect*?

"A  Are you asking me if I do that?

"Q  Well, it is done in the normal course of your police business; isn't it?

"A  Not that often.

"Q  Well, it is done?

"A  I'd say it is done, yes.

"Q  What I am after in this particular case is you filled out a lab report and sent the prints to the lab and said *compare these prints with a certain individual*; is that right?

"A  Yes."

Further cross-examination of Officer Clough by the defense counsel indicated:

"Q  I don't want you to go into the reasons why, because that would be hearsay but immediately you made Charles Sharp a suspect in this robbery, did you not, and that was why his photograph was included in the group that you showed the victim?

"A  Not immediately during the robbery.

"Q  You can answer that. The same day of the robbery? He was alleged to have been a suspect in the crime, wasn't he?"

Cross-examination of Officer Anderson included the following regarding one Charles French, an informant who allegedly directed police suspicion to Charles Sharp:

"MR. HOWEN: I am going to object to that, Judge, as calling for hearsay. If it is offered for impeachment there is nothing to impeach the record at this time.

"MR. MATTHEWS: The only thing I am after, your Honor, is the motive that this particular officer in the manner in which he proceeded to take the statement he did.

. . . . .

"Q  Were you aware that Charles Sharp, my client, also was involved in c. b. radio in the valley?

"A  Yes.

"Q  Were you aware that approximately two days before this particular armed robbery for which he was charged, that Charley Sharp put out on the c. b. radio in this valley the fact that Charley French was an informant and was turning in a lot of his friends for the use of marijuana?

"A  No, I wasn't aware of that."

One Chris Crosby was Sharp's girlfriend at the time of the robbery, but at trial she and Sharp had established a common law marriage and she was thus incompetent to testify. Defense counsel cross-examined Officer Anderson regarding a late night statement which had been taken by him from Chris Crosby at Anderson's home in the presence of Charles French.

"Q   Apparently this was fairly well planned, the manner in which you taped this statement because earlier in the day you picked up the necessary rights forms and assembled it at your house for this session you were going to have; is that right?

"A   It wasn't planned at that particular time, no."

Defense counsel's cross-examination of Officer Anderson also included questions concerning threats he had allegedly made to Chris Crosby if she refused to give a statement. Additional cross-examination of Officer Clough contained the implication that the statement of Fred Boyce had been coerced.

"Q   So, you had Fred Boyce here, who is the brother of Charley Sharp, stopped on the road and brought in after an A.T.L. for his vehicle. Told him you had prints and you had this folded up statement and you told him that he better give you the right kind of statement or he was going to be charged with accessory after the fact.

[Objection overruled.]

"A   That is not correct.

.     .     .     .     .

"Q   In addition to telling him that you had fingerprints and this folded up statement from someone, you told him you now had the coat that matched the description of the victim of the crime, and there was blood on it?

"A   I didn't mention anything about the blood at that time."

Defense counsel's cross-examination of Vonda Dudley raised the voluntariness of her statements given to Officer Phelps.

"Q   Now, when Detective Phelps came to you and said 'You better cooperate or else,' and he told you these things that you just testified to, did he tell you anything about some evidence that they had to confirm that Charley Sharp committed this robbery?

[Objection overruled.]

"A   He told me that Chris and Fred had already made statements and he handed me Fred's to read, but he just showed me Chris's, but he wouldn't let me read it. And then he said that they had Butch cold anyway, because they said that he had a sandwich when he was in the store and they found fingerprints on the wrapper from the sandwich where he throwed it in the garbage.

.     .     .     .     .

"Q   What I am really after is, was what was in that statement your own thoughts or *did he tell you what to put in the statement*?

"A   There is some of the things in the statement that are things that he said and I just wrote them down. I said them, but I didn't say that Butch said this or that, that I put in the statement.

I said that I was told that or it had been said, you know, *he just said to put Butch said*, and then he told me write parenthesis or put these things around it, and I put Charles Sharp on it."

Defense counsel's cross-examination of Fred Boyce contained questions as to whether Boyce's statement to the police had been coerced, whether he had been told that the police had Charley "cold" and whether the police had helped draft the statement.

Officer Phelps took possession of the gun retrieved from the Boise River and he testified that he had cleaned and oiled the gun because he thought the gravel and the current of the water had already destroyed any evidence of fingerprints or blood. Cross-examination of Officer Phelps by defense counsel contained the implication that Phelps had cleaned the gun for other reasons.

"Q   You took a very personal interest in this case and Mr. Sharp; didn't you, Officer Phelps?

"A   He consumed a great deal of my time for a couple of weeks after the robbery, yes.

"Q   In fact, you would do anything to see him convicted, wouldn't you?

"A   Just about anything is pretty broad.

"Q   I know it is.

"A   I would give my full effort, yes.

"Q   I am asking you if you would do anything to see him convicted?

"A   Not anything, no."

When, upon redirect, Phelps was asked if he had framed Sharp, defense counsel objected on the basis that the question of a frame-up was for the jury to make.

"MR. MATTHEWS: Your Honor, I will object to that.   I think this is an *ultimate decision for this jury to make* and I think also he can testify what was done or hasn't been done, but I don't think he can take away part of the jury in this case."

On recross-examination of Officer Phelps by the defense counsel, the following occurred:

"Q   You say you have not framed Mr. Sharp and you have not falsified any evidence, but isn't it a fact if there was any evidence of any inculpatory nature or might assist Charlie Sharp in this particular case contained on Exhibit 33 that you took from the river, that you destroyed whatever evidence that might have been of value that might have been on it?

"A   I don't understand the question.

"MR. MATTHEWS: No further questions, your Honor."

The record does in fact support the argument of the State and reveals that defense counsel effectively placed before the jury its theory that the police officers involved were out to get Sharp, that their methods of obtaining statements of witnesses and gathering or not gathering probative evidence established their motives to "frame" Sharp.  In fact, defense counsel specifically stated that the question of a "frame-up" was an ultimate decision for the jury to make.   Hence, the prosecution was legitimately entitled to point out the absurdity of such an assertion and to emphasize the improbability that Sharp was the subject of such a "frame-up."   Nevertheless, we agree that the prosecutor placed entirely too much emphasis on his own integrity.   Although such is a close question, we hold that his comments were not so prejudicial as to require a reversal of the conviction.

I.C.R. 52 provides: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

In cases prior to the adoption of I.C.R. 52, the following standard was adopted regarding whether prosecutorial misconduct in closing argument was reversible or harmless:

"Where the issue of guilt is debatable or it appears from the record that the jurors could have reasonably entertained doubt as to the defendant's guilt and the prosecuting attorney's misconduct might have influenced the result, a conviction will be reversed."   74 Idaho at 184, 258 P.2d at 1154.

In the more recent case of *Smoot*, the appellant argued that the prosecution made improper comments in the closing argument which were calculated to inflame the passions and prejudices of the jury in that the prosecutor had injected some personal comment and made several references to an irrelevant fact, *i. e.*, that the defendant had a wife who was eight months pregnant at the time of the rape.   There we cautioned prosecutors to avoid references to personal opinion and irrelevant material, but found no prejudicial error because the record, in our opinion, revealed no reasonable possibility that the prosecutorial misconduct in the closing argument contributed to the guilty verdict.

■   As stated in *Smoot*, the purpose of a harmless error rule is to "block setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the results of the trial."   *Chapman v. California*, 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 750 (1967).   To hold an error as harmless, an appellate court must declare a belief, beyond a reasonable doubt, that there was no reasonable possibility that such evidence complained of contributed to the conviction.   *Id.* at 24.

■   We hold that beyond a reasonable doubt there was no reasonable possibility that the prosecutorial comments complained

of here contributed to the conviction of Sharp. The State's case, albeit circumstantial, was strong and the record makes it appear highly probable that Sharp did commit the crime, a conclusion which was obviously shared by the jury in view of their guilty verdict.

Although the prosecutor injected his personal integrity into his remarks, in substance he stated he was insulted that the defense had suggested a frame-up existed and that the accusation was absurd. He further explained to the jury the purpose of closing arguments and emphasized that what he was about to say was *not* evidence, but only what he personally believed the evidence suggested. He cautioned the jury that it was their recollection of the evidence that should control the decision rather than his own. He further reminded the jury that it was the State who must carry the burden of proof throughout the trial and then reviewed the testimony and the inferences he believed arose therefrom.

We hold that the statements of the prosecution contained in the closing argument relating to a frame-up to be non-erroneous. As to those comments in the closing argument of the prosecution relating to the personal integrity of the prosecutor, while we hold them to be erroneous, we further hold them to be non-prejudicial.

The conviction is affirmed.

DONALDSON, C. J., BAKES, J., and SCOGGIN, J. Pro Tem., concur.

BISTLINE, J., dissents in separate opinion.

1. Beatty was apparently merely waiting for a friend's case; however, he disappeared by the time of trial.

2. The victim could testify only that she saw the robber holding a handgun:
   (on direct examination)
   "A: The only thing I noticed was it had a dark barrel. It was dark brown or black, was long, seemed to be extra long, longer than one I had ever seen.

BISTLINE, Justice, dissenting.

It may be of some solace to the defendant, Charles Sharp, to know that at one time a majority of the Court were of the opinion that he was entitled to a new trial. In the appellate process, as with juries, minds do change and I stand alone in my opinion that Mr. Sharp has not yet had the fair trial to which all are entitled. Defendant may rest assured that there has been full discussion on the issues presented in his behalf.

Sharp assigns several alleged errors occurring at trial, including improper remarks made by the prosecutor in his closing argument. Agreeing with this contention, and finding other error, perhaps not reversible taken on an individual basis, I would hold that the defendant was denied his right to a fair trial.

The evidence adduced at trial was entirely circumstantial. The store employee who was robbed was able to give little description of her assailant. She admitted to having been unable to select defendant's picture from a group shown her by police on the day of the robbery. She also admitted that at the preliminary hearing, when asked if the attacker was present, she had pointed to one James Beatty who was sitting at the back of the courtroom, although defendant sat at his counsel's side.[1]

The victim testified that the robber carried a red motorcycle helmet with white trim and wore a light brown jacket; a motorcycle was parked outside. Her testimony of the gun he carried was also sketchy.[2] There was some evidence that defendant had changed his appearance and at some earlier date would have more closely fit the description she gave, but the time of such change was unclear. One clear

"Q: Was the weapon ever pointed at you directly?
"A: Well, yes. It was when I turned around when he had it in his hand. When— but that is the only time I really looked at it. (on cross–examination)
"Q: I take it to be frank you can't really recall whether it had that revolving type of mechanism or whether it was the type that had a clip?
"A: I didn't see that part of it."

fingerprint was found on a bottle broken over the victim's head. It was not the defendant's. There was blood from the victim on the bottle fragments; blood found on defendant's coat turned out to be not human, but bovine.

Defendant's step–brother and step–sister were called by the prosecution; both testified that defendant had jokingly said he committed the crime. When they asked defendant about the pistol–whipping of the victim, apparently mentioned on the news broadcasts, they said that he had retracted his "confession," stating that he would not do such a thing. There was some unclear testimony to the effect that defendant may have mentioned the bottle, although the broadcasts apparently did not refer to it.[3] Both witnesses claimed that the police had threatened them with being charged as accessories. Both stated that they were told they would be in trouble and lose their children (both were ex–felons). Both stated that police officers indicated that defendant's fingerprints had been found at the scene. The step–brother claimed he was taken in custody at gunpoint to give his statement.[4] One officer also admitted writing to the prosecutor that he would do "anything" to convict defendant.

The step–brother admitted he had loaned defendant his motorcycle and a helmet. The helmet was metallic red *without* white trim. Defendant's sister testified that on the evening of the crime, defendant brought her a paper bag containing a gun and asked her to get rid of it, stating that he was on parole and would be in trouble if he was caught with it. She testified that she put some rocks in the bag and threw it into the Boise River. Her testimony was to the effect that the gun was a revolver with the cylinder out. At trial, when shown the alleged crime weapon, she insisted it was not the same gun. The police recovered an automatic pistol, brown and/or black, about 20 feet from where she had shown them as

being the place where she threw the bag into the water. This particular gun belonged to one Vance Fleming. Defendant had been to Fleming's house; the two left together and Fleming testified that upon his return he found the door unlocked and the gun missing. Fleming from this assumed defendant had stolen it, and so testified.

Defendant was apprehended in Oregon upon information received by police. Although he tried to evade officers, it was not clear that the trip was in flight, as he was apparently on the way to see his fiancee and had just seen his step–brother in Portland; he at first claimed to be his step–brother. He did return to Idaho voluntarily.

I.

The first argument raised by defendant is that his right to a presumption of innocence was violated by the giving to the jury of instruction No. 3. That instruction included a verbatim reading of the information, containing the following language:

"Charles Sharp is accused by this Information of the crime of Robbery, I.C. 18–6501, felony upon which charge the said Charles Sharp having been duly brought before a Magistrate on the 4th day of November, 1975, and *having had his preliminary examination thereon upon said charge, by said Magistrate thereupon held to answer to the District Court of the Fourth Judicial District of the State of Idaho* . . ." (Emphasis added.)

Defendant's counsel moved to excise the above italicized language, which motion was denied. Defendant argues that the portion of the charge which I have emphasized could give a jury the impression that a magistrate has already found him guilty of the crime charged, thus violating his right to due process under the Fifth and Fourteenth Amendments of the United States

---

**3.** No evidence was introduced as to what the broadcasts actually said.

**4.** Parts of their prior statements to police were admitted as impeachment and parts as substan-

tive evidence; other parts were excluded. The district judge apparently applied the Federal Rules of Evidence. However, there is no appeal on these grounds.

Constitution. This portion of the instruction should not have been given. It is neither relevant to nor probative of anything that was for the jury's consideration, and it is at least potentially, if not clearly, prejudicial to the defendant. There is no valid reason for a jury to be given the fact that a magistrate has held a defendant to answer; very few lay jurors could be expected to correctly comprehend the questioned portion.

This situation is in some respects very similar to that of a defendant facing a charge for a crime allegedly committed, together with another charge for being a repeat or habitual offender. In those cases it was held that reading the entire information, including the habitual offender charge, to the jury at the outset of trial constitutes reversible error. *State v. Wiggins*, 96 Idaho 766, 536 P.2d 1116 (1975); *State v. Johnson*, 86 Idaho 51, 383 P.2d 326 (1963):

> "The possibility of prejudice against defendant resulting from evidence or knowledge of prior crimes outweighs any policy argument . . .
>
> " 'It seems too plain for argument that to place before a jury the charge in an indictment, and to offer evidence on trial as a part of the state's case that the defendant has previously been convicted of one or more offenses is to run a great risk of creating a prejudice in the minds of the jury that no instruction of the court can wholly erase * * * ' " *Wiggins*, 96 Idaho at 768, 536 P.2d at 1118 (citations omitted).

Arguably, inclusion of this information in the jury instructions, containing as it did the reference to the implicit "finding" of the magistrate, is considerably less serious than the reading of an information referring to prior offenses, particularly of the same type; nonetheless the same principle applies. By far and large the informations which we see on appellate review do not contain such unnecessary recitals; where a prosecutor does put such recitals into an information, the trial court should either strike it, or at least not read it to the jury. Here defendant's counsel raised a specific objection.

A trial attorney with any criminal experience will readily see that a jury might mistake a magistrate's finding of probable cause as tantamount to a prior judicial adjudication of a defendant's guilt. Absent any other error, the reading of the recitals of the information might not require a new trial. Here the error, taken with other error, requires a new trial at which the information, or portion thereof, read to the jury, should omit any reference to the defendant's preliminary hearing.

## II.

Defendant's second assignment of error concerns the use of the transcript from the preliminary hearing. Both attorneys had subpoenaed James Beatty, the above–mentioned bystander who had been identified at the preliminary hearing as the assailant; however, he could not be found. In an effort to avoid delay in the State's presentation of its case, defense counsel stipulated that the prosecution could thereafter re-open its case and call Beatty as a witness, if he could be located. When the defense closed, the prosecution, still unable to find Beatty, proposed that his testimony from the preliminary hearing be read instead. This was allowed over defendant's objection that the procedure went beyond the stipulation, and was improper.

Defendant complains that this procedure violated his right to confront the witnesses against him, relying upon *State v. Villarreal*, 94 Idaho 246, 486 P.2d 257 (1971).[5] In response, the State makes two arguments. First, it asserts that *no proper objection was voiced* and that the defense was merely

---

**5.** In *Villarreal* this Court considered the recently decided case of *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). There the Supreme Court of the United States held that testimony from a preliminary hearing could be used to refresh the memory of a wit-

ness who testified directly at the trial. This Court found that *Green* did not cover–except by way of dictum–the situation where the preliminary hearing testimony is offered at trial because the witness is unavailable to testify.

objecting to an improper reopening of the State's case. The objection voiced by defendant, although not specifically mentioning the word "confrontation," adequately exhibited concern for a lack of opportunity to cross–examine Beatty.[6]

Second, the State urges that *Villarreal* is not controlling. Its argument is two–fold: First, *Villarreal* is only a two–page affirmance of a trial court's exclusion of preliminary hearing testimony of a witness unavailable at trial, and therefore carries little weight; and second, that the case does not stand for a *per se* rule of exclusion but rather supports a case–by–case weighing of various factors. Both arguments are unpersuasive.

We must be careful to distinguish the different purposes for which the State may seek to introduce testimony given at a pretrial examination. First, as in *Green*, the State may want to introduce earlier testimony to impeach the testimony now given by a witness. In *Green* the witness testified at a preliminary hearing that the defendant had sold him drugs, but then at trial claimed that he himself had been on drugs at the time and could not say for sure what had taken place. The prosecution introduced the witness's prior testimony to "refresh" his memory, and got him to agree that he "guessed" his former testimony had been accurate. The basis for upholding the conviction in *Green* was that there had been full opportunity for the defense to cross–examine the witness at trial and to refute the version given earlier at the preliminary hearing.

A much different case is presented where the witness is not present at trial, and the former testimony is introduced for the truth of the statements made. Unfortunately, the Supreme Court in *Green* went on in dicta to opine that the testimony in that case would have been admissible even if the witness had been unavailable, on the theory that cross–examination of the wit-

ness at the preliminary hearing fulfilled the requirements of the confrontation clause. The rule of *Villarreal* is more closely patterned to the requirements of our own preliminary hearings. ·

*Territory v. Evans*, 2 Idaho 627, 23 P. 232 (1890) was the first Idaho case to consider the question of allowing the use at trial of testimony taken before a magistrate at the preliminary hearing. However, that decision was shortly overruled by *State v. Potter*, 6 Idaho 584, 57 P. 431 (1899). In *Potter* it was noted that our state constitution dropped the confrontation clause contained in the federal constitution, thus leaving the matter with the legislature, which had not acted to allow such use of prior testimony. The legislature had not altered the law since then or since the decision in *Villarreal*. While there is statutory authorization for the use of depositions, I.C. §§ 19–3110, 19–3111, 19–3112, and 19–3214, there is no such authority for the use of testimony from the preliminary examination. Finally, as noted in *Villarreal*, the Supreme Court's dicta in *Green* that the use of a witness's prior testimony when he is unavailable at trial does not in any way prevent Idaho from maintaining, as it has for eighty years, a more restrictive rule.

*Villarreal* reaffirmed the rationale for this rule as stated in *Potter*:

" 'When we recall, as every lawyer who has any extended experience in criminal law practice may do, how very perfunctory these preliminary examinations are, not only on the part of the prosecution, but more frequently, of necessity, on the part of the defendant, the uncharitableness of the rule is apparent. It is always the policy of the prosecution, on preliminary examinations, to only carry its investigations to the extent necessary to secure the holding of the defendant; and it is seldom that the defendant feels warranted in going fully into his defense upon a preliminary examination before a court, where it is only required that it

---

**6.** Interestingly, it was not the State but defendant who called Beatty to the stand at the preliminary hearing (a different defense counsel, however), perhaps expecting him to break

down and confess in the best Perry Mason tradition. However, Beatty did not do so. No real examination occurred, as Beatty merely stated that he was not involved.

shall be made to appear that the offense named has been committed, "and that there is sufficient cause to believe the defendant to have been guilty thereof." To say that the exigency of that rule of universal recognition among people of the Anglo–Saxon race, and in this country, may almost be said to be an inalienable right, which requires that a person charged with the commission of a criminal offense shall be confronted with his accusers, is met by such a tentative proceeding as a preliminary examination usually is, seems to us "keeping the word of promise to the ear and breaking it to the hopes." It smacks too much of the methods in the *Dreyfus* case.' 6 Idaho 584, 589, 57 P. 431, 432." 94 Idaho at 248, 486 P.2d at 259.

Since *Villarreal* the Court in *State v. Ruddell*, 97 Idaho 436, 439, 546 P.2d 391, 394 (1976), stated:

"Appellants further argue that because of the method utilized to alter, amend and clarify the transcript in the absence of the presence of themselves and their counsel, they were denied the right to use the preliminary hearing for discovery purposes. While the value to the defendant of the opportunity for discovery through the medium of a preliminary hearing may be an ancillary benefit, such has not risen to a status cognizable as a constitutional right. It is clear, however, that the primary purpose of a preliminary hearing is to determine whether there is probable cause to believe a crime has been committed and that the defendant committed it."

*Ruddell* is cited in the discussion of our criminal rule 5.1 in the Course Materials of the Institute on the Idaho Criminal Rules and Misdemeanor Criminal Rules conducted earlier this year throughout the State by the Idaho Law Foundation, for the very proposition above stated. See Course Materials Pamphlet at 23.

This case presents a fine example of the kind of situation which the *Villarreal* rule is

designed to prevent. The victim identified Mr. Beatty as her assailant. In a brief appearance at the preliminary hearing Beatty denied any involvement in the crime. At trial defendant attempted to raise a doubt before the jury as to whether he was the assailant by calling the jury's attention to the victim's earlier identification of Beatty. The prosecution's introduction of Beatty's prior testimony, consisting only of the identification at the preliminary hearing and his denial, was obviously an attempt to minimize the impact of defendant's evidence as to the victim's earlier identification of Beatty. However, with Beatty not present at the jury trial, defendant had no opportunity to examine him. It cannot be said that defendant, given an opportunity to cross–examine Beatty, might not have raised some doubt of defendant's involvement. Standing alone it might not constitute reversible error, and arguably did not go to the real merits of the case, *i. e.,* the defendant's guilt or innocence. The use of Beatty's testimony was error which with the other error, sufficiently prejudiced his right to a fair trial, and on retrial such testimony should be excluded.[7]

### III.

The third contention on appeal is that prejudice arose from the testimony of Fleming that defendant had stolen Fleming's gun. This was the gun found in the river; there is no dispute that it was Fleming's, and defendant does not seem to claim that he did not steal it. Rather, he argues that he was not charged with larceny of that gun, and its theft is not in any way probative on the charge for which he was being tried—robbery of the Circle K. Although it is not readily seen that the State necessarily needed to introduce evidence as to the manner in which Fleming's gun came into defendant's possession, it would *ordinarily* be in the trial court's discretion to determine the probative value as against resultant prejudice to the defendant.

*State v. Shepherd*, 94 Idaho 227, 486 P.2d 82 (1971), stated the rule that:

---

7. *See also State v. Roberts*, 55 Ohio St.2d 191, 378 N.E.2d 492 (1978), also holding such testimony precluded under the Sixth Amendment to the United States Constitution.

"[E]vidence of other crimes by the defendant is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of the one tends to establish the other, (5) the identity of the person charged with the commission of the crime on trial, and (6) other similar issues." 94 Idaho at 230, 486 P.2d at 85 (citations omitted).[8]

*Accord, State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978); *State v. Izatt*, 96 Idaho 667, 534 P.2d 1107 (1975); *State v. Hatton*, 95 Idaho 856, 522 P.2d 64 (1974).

*Hatton* stated that "[e]vidence of other crimes committed by the defendant is relevant to the issue of identity if it discloses a distinctive *modus operandi* common to the other crimes and the crime with which the defendant is charged." 95 Idaho at 864, 522 P.2d at 72. *Accord, State v. Morris*, 97 Idaho 420, 546 P.2d 375 (1976).

*Izatt*, after citing *Shepherd*, explained what could be presented from a different viewpoint, that of the "inseparable transaction":

"The state is entitled to present a full and accurate account of the circumstances of the commission of the crime, and if such an account also implicates the defendant or defendants in the commission of other crimes for which they have not been charged, the evidence is nevertheless admissible. The jury is entitled to base its decision upon a full and accurate description of the events concerning the whole criminal act, regardless of whether such a description also implicates a defendant in other criminal acts." 96 Idaho at 670, 534 P.2d at 1110.

*See State v. Crawford*, 99 Idaho 87, 577 P.2d 1135 (1978).

The admission of testimony of the alleged theft of Fleming's gun under these tests presents a close question. The trial judge apparently admitted the evidence on two theories: first, that it tended to show intent; and second, that it was necessary to show all of the facts and circumstances of the crime.

Intent may be shown by other crimes where intent as an element of the crime is raised as an issue. Here the trial court may have had in mind that a stolen gun is more likely to be used in a robbery or other crime because it cannot be traced, directly or indirectly, to the thief. At best, such would be extremely slight in its probative value of defendant's involvement in the Circle K. robbery.

Even though the theft of the gun and the robbery of the Circle K occurred but nine days apart, where the two said crimes bore no likeness one to the other, there was an abuse of discretion on the part of the trial court in allowing Fleming's testimony.

*State v. Thomas*, 94 Idaho 430, 489 P.2d 1310 (1971), stated the rule that sums up this case:

"We know of no rule of law that requires the State to so restrict its proof when the evidence which *is so highly probative* of the crime charged also reveals the commission of other crimes. If the evidence has no real bearing on the guilt or innocence of the accused and would be highly prejudicial, then such of course should be excluded." 94 Idaho at 434, 489 P.2d at 1314. (Emphasis added.)

The Court's opinion neither mentions nor discusses that Sharp's counsel offered to stipulate that Sharp had acquired the gun which was retrieved from the Boise River. The trial court apparently was of a belief that it was a matter of prosecutorial discretion to accept or reject the proffered stipulation. The prosecutor declined to stipulate and the trial court allowed Fleming's testimony as to Sharp's stealing of the gun—a crime with which Sharp was not charged.

The trial court then thought itself to be in the position of weighing the probative value of the admission of prior–crimes evidence against the conceded prejudice to

---

8. *Shepherd* actually concerned whether a defendant admitting a prior felony conviction could be forced to divulge the nature of that conviction, the court answering in the negative.

Sharp, and, giving serious consideration to the problem, ruled the evidence admissible. This was error. I find nothing in any of our Idaho cases which puts a trial court to that particular balancing act where a defendant offers to stipulate to that which the State seeks to prove. Here the damaging evidence against Sharp was that shortly after the commission of a crime at the Circle K he handed a gun to his sister, who threw it into the river at his instruction, and the police retrieved a gun from the river at the point where she threw it in. That gun, though not *at all* identifiable by the victim at trial, was nevertheless a gun, and circumstantially appeared to be the gun which Sharp had asked his sister to dispose of as she did. It had probative value in the circumstantial case against Sharp.

As to how Sharp acquired the gun however, the prosecutor wanted to show the jury that he had stolen it [9]—evidence of an-

---

9. The prosecutor did not give any reasons for his refusing defendant's offer:

"THE COURT: All right, I understand counsel might have a motion.

"MR. MATTHEWS: That is correct, your Honor. I suppose it is more of a motion in limiting, and I want to advise the Court about our position on the matter.

"Mr. Howen has advised me that he intends first of all to call some person by the name *of Purcell and another person by the* name of Vance Fleming to prove that the gun purchased by Vance Fleming is the same weapon found in the Boise River, which he intends to produce in this case.

"I believe because of the nature of the testimony it will in essence be putting before this jury by Mr. Fleming's testimony, evidence of another possible crime, which we feel would be highly prejudicial to Mr. Sharp's position in this case.

"We would, therefore, move the Court to *limit the prosecution in such a regard in* showing evidence of any other crime, and we would state to the Court that at this time we would be willing to stipulate that the weapon in question belonged to Mr. Fleming and was purchased from Purcell.

"THE COURT: Mr. Howen, do you have any comment?

"MR. HOWEN: Your Honor, that would be unacceptable to the State because of the number of factors which I intend to prove.

(Argument by both counsel.)

"THE COURT: I think maybe this is an important point so that we should take a look at it, and we will recess while we get those. Let me know when you are ready to proceed again. You can bring the authorities to me in chambers. If you have any authorities, Mr. Matthews, you may do the same.

"We will be in recess subject to call.

"MR. MATTHEWS: Thank you.

(Whereupon, a recess was taken at 1:40 p. m. and court convened at 2:10 p. m.)

"THE COURT: All right. The Court is again in session. We have a defense motion to limit, to exclude certain evidence which he feels is evidence of a prior crime which is not admissible ordinarily under the Idaho Rules.

"The Court finds that subject is discussed in Bell's Handbook of Evidence for the Idaho Lawyer at page 121. It indicates the general rule that evidence of a prior criminal act is not admissible. It does, however, list certain exceptions. These exceptions are found in more detail in *State versus Shephard* cited at 94 Idaho 227 [486 P.2d 82] decided in 1971. This case lists precisely these exceptions. I will read from the book, page 230 [486 P.2d 82]:

"The Supreme Court speaks: 'We want it clearly understood that in changing the rule as we have in this decision, we do not disturb the rule that evidence of other crimes by the defendant is admissible when relevant to (1) motive, (2) intent, (3) the absence of mistake or accident, (4) a common scheme or plan embracing the commission of two or more of the crimes so related to each other that proof of the one tends to establish the other, (5) the identity of the person charged with the commission of the crime on trial, and (6) other similar issues.'

"That case has been cited in other cases, *State versus Hatton*, 95 [Idaho] 856 [522 P.2d 64] evidence of other crimes is admissible to show modus operandi and *State versus Shields*, 96 Idaho 492 [531 P.2d 582], which I do not believe is pertinent. It involves an escape, that he was incarcerated because of a conviction of a felony.

"*State versus Dayley*, 96 Idaho 257 at page 528 [531 P.2d 1172] cites the *Shephard* case as applied in the *Dayley* case: 'that evidence of other crimes was admissible when relevant to (1) motive or intent.' In that case they were talking about writing dishonored checks for the purpose of impeachment.

"The case with the most point seems to me is *State versus Izatt* at 96 Idaho 667 [534 P.2d 1107]. It cites a rule from the *Shephard* case that I already read to you.

"Then talking about the *Izatt* case, the Supreme Court of Idaho said: 'We do not agree that the introduction of the evidence here in question does not fall within an exception concerning introduction of evidence of other crimes regardless of whether this exception fits neatly into one of the categories we listed in *Shephard*. As was well stated in the Colorado Supreme Court in *Monge verus People*,

other crime–which Sharp could not counter unless he took the stand to testify against Fleming's version. No one can seriously argue that Fleming's testimony that Sharp stole his gun was not prejudice of the highest magnitude. Nor will anyone claim that he could not counter that damaging evidence of the commission of another crime without waiving his Fifth Amendment rights.

Anything that has been written, either on evidence showing involvement in other crimes, or as proof of other crimes (as offered to impeach witness credibility), is in total agreement that neither are properly admissible where the sole purpose is to prejudice the defendant. Where there is some apparent probative value, and the defendant offers to stipulate to its admission, common sense alone suggests that the court should allow the evidence–thus removing any need to consider the weight of the prejudicial effect, and not calling into play the court's exercise of discretion in that regard.

As the Court's opinion points out, the prosecution presented much evidence which was probative of nothing whatever. But included in its evidence was the fact that Sharp did have a gun which he wanted disposed of shortly after the crime. Where Sharp was willing to so stipulate, the trial court, who sits to see that justice is done, should have accepted the stipulation (as readily as he would have accepted a guilty plea) and so advised the jury. The resultant improper prejudice would have thus been avoided. It is all too clear that the prosecutor refused to accept the stipulation on the sole premise of hoping that a favorable ruling would enable the State to show the jury that Sharp stole Fleming's gun–

"all facts inseparably connected to the chain of events of which the act charged in the information is a part are admissible even though the full story shows the commission of other crimes," ' The Court said, 'we adopt that rule.' *State versus Izatt* has, I believe, six offenses charged in that case.

"All right, Now, taking the situation here that we have that the State wants to offer this evidence. To prove intent for one thing; to prove that he had the means by which a crime could be committed, that he had the pistol apparently, that he had a similar one that was seen by the victim. It falls into this situation here of being able to show all the facts and connection with the chain of events.

"The fact that the gun was taken might constitute another crime of theft, since that was established by evidence that the State proposes to offer could constitute by circumstantial evidence and intent that the gun was taken for purposes of committing a robbery. In other words, that could constitute on that rule on circumstantial evidence that there was intent to use the gun for committing robbery.

"I think all things taken into consideration, the evidence that the prosecution proposes to submit for consideration is admissible under the exception to the general rule.

"I might say further that these exceptions are discussed in McCormick on Evidence, page 328, the 1954 edition, where all exceptions are listed. The first exception listed is: 'To complete the story of the crime on trial by proving its immediate context of happenings near in time and place. This is often characterized as proving a part of the "same transaction" or the "res gestae".'

"It also lists exceptions that were already discussed concerning motive and intent. That is mentioned in McCormick on page 230.

"Also the revolver identified at the time, the evidence that the Prosecution proposes to submit would bear on this, I believe. For all those reasons, I would have to admit the evidence.

"MR. MATTHEWS: I would only further point out to the Court that it is my understanding the Prosecutor's evidence indicates that the alleged disappearance of the weapon happened on the 19th, and this alleged robbery occurred on the 28th of the month. I should point that out.

"THE COURT: I understand the time. I don't believe the distance between the two dates is remote. What is that, seven days?

"All right, I believe we are ready to proceed if counsel are.

"MR. HOWEN: Fine with the State. The State is ready.

"MR. MATTHEWS: We are ready.

"THE COURT: All right. Bring in the jury.

"MR. MATTHEWS: Your Honor, can the record reflect a continuing objection?

"THE COURT: Let the record show a continuing objection, and your objection is overruled.

"May the roll call of the jury be waived?

"MR. HOWEN: Yes.

"MR. MATTHEWS: Yes.

"THE COURT: We will proceed with the State's case."

which evidence Sharp was totally unable to combat without waiving his Fifth Amendment privilege against self–incrimination. The trial court thus was in error. Borrowing from the dissenting opinion in *Spencer v. Texas*, 385 U.S. 554, 581, 87 S.Ct. 648, 662, 17 L.Ed.2d 606, 624 (1967) (Warren, C. J., dissenting), "For me, the State's refusal to accept the stipulation removes any vestige of legitimate interest it might have to balance against the prejudice to the accused."

### IV.

The final assignment of error on appeal is the matter of the prosecutor's closing remarks, which taken alone were highly improper, and which constitute an independent basis for reversal. The extent to which the prosecutor made his own integrity and competence the central issue in the case, rather than the evidence on the guilt or innocence of the accused, is readily apparent.

"You have heard in this trial allegations that this is a frame; this is a setup; ladies and gentlemen, this is the worst frame job I have ever seen by law enforcement in my life. Officer Clough, Officer Phelps *and I* have done the lousiest job you can even comprehend . . . .

.          .          .          .          .

"And ladies and gentlemen, *we* didn't have the foresight to take a little blood of Mabel Eberhart and splash it on the gun. We didn't have the foresight to take a little thing of blood type of Mabel Eberhart and splash it on the jacket. We are so incompetent that we went out and took some blood from a cow and sprinkled it on there. What did we do? Then we sent it to the State laboratory for analysis; so, that then the lab comes in and says, 'My God, that is cow blood on there.'

.          .          .          .          .

"Now, *we* are either experts at forgery of Mr. Boyce's signature as to what is marked as the first statement that he gave or, I think that Mr. Boyce may be somewhat mistaken and really has difficulty remembering where he placed his initials on what document.

"If we are going to do a forgery, ladies and gentlemen, let's do a good forgery. Let's type up a statement of Mr. Sharp admitting to the crime and let's forge his signature to that and let's do a good job, not a poor job.

"Taking the allegations that *we* falsified circumstantial evidence in the case, but not direct evidence. If we are going to frame a job, let's do a good one. When it comes time for the preliminary hearing, let's take Mabel Eberhart in my office with the officers and say, 'Look, the defendant doesn't look the same. Now, I will tell you what to do, Mabel. When you go in there he will be seated at the little table and there is a little sign that is marked plaintiffs on one side and a little sign that is marked defendant, and he will be seated at the table that is marked defendant and I will be seated at the one that is marked plaintiff. I will be in a suit and the other gentleman who is the attorney will be in a suit and Mr. Sharp will have altered his appearance. He does not have blond hair. He has shaved off his moustache. You will know right where he is and even I will indicate to you where he is seated.'

"Then, I suppose we are supposed to tell Mabel Eberhart to keep her mouth shut about this, to be quiet and don't tell anybody. 'If the Judge asks you, be sure to keep your mouth shut.' That is direct evidence. If we are going to do a frame job, let's do it right. Let's tell Mabel Eberhart to go in and identify the guy that is seated to my right at the preliminary hearing, and if we are even going to do even more, let's go get the fingerprint card of Charlie Sharp that is on record. Let's take Jack Carroll up there and let's lift a print off of that card. And then let's testify that we took it off of that bottle; let's testify that we took it off that gun. Let's testify that we took it off of that cooler in there.

"I think you have to conclude that this is the worst frame job that you have ever heard of. *You are going to have to con-*

*clude that we are completely incompetent at this frame job. You are going to have to conclude that I am going to sacrifice my entire legal career and the officers are going to sacrifice their careers for this one case. If you believe that law enforcement did this, that we framed Charles Sharp on this case, you can do one thing. You can acquit the defendant right now. Don't pick a foreman for your jury. Don't read the instructions; if all twelve of you go in there and agree that this is a frame, by God, acquit the defendant.*

.    .    .    .    .

". . . I think there is one really key instruction, and I am not going to tell you more than the others, the instructions don't tell you that, but one of the key instructions to you is where the State's case relies either entirely substantially on circumstantial evidence that you have a duty. If both theories that you hear are reasonable, then your duty is to acquit the defendant. I wholly agree with that.

"If you think you are going to hear two theories that are reasonable and you can't decide between the two, I will tell you right now you will acquit the defendant, that is your duty. And I am not going to tell you, and I am not going to argue any different what the law tells you precisely to do. This isn't a direct evidence case and I revealed that to you earlier in my opening statement; the identification, forensic evidence. It was going to be a circumstantial evidence case.

"Ladies and gentlemen, *either this is a frame, this is a setup or it isn't. It is one of the two.* Both theories, at least as I analyze the evidence can be reasonable. *It is one or the other.* I am not trying to play hide [the] ball on this case. My file has been opened to the defense. We presented physical evidence, presented cow blood on the coat, presented the rest of the testimony. I am going to urge to you, ladies and gentlemen, in my response to what Mr. Matthews will say, that you do return a verdict of guilty as charged. Thank you.

"MR. HOWEN: [after defense closing argument] Ladies and gentlemen, Mr. Matthews has accused me at various times of having interjected myself personally in this case. He is incensed about this. Well, he is incensed about Paul Phelps and what we did with the evidence. He is, I guess, also personally involved as far as his comments are how the officers have performed in this case.

"Let's take a look at this. Let's make no bones about it. *I am incensed at the accusations that have been made by two witnesses that have testified in this case that this is a frame.* You have heard the testimony and perhaps Mr. Matthews doesn't recall it, but I was the one that gave the authority for the arrest and it was subsequent to the obtaining of the initial statement that was given to Lance Anderson.

"I have handled the preliminary hearing and I have prepared this case. There is no way around that. *It does incense me that people will come in here and accuse the Prosecution of a frame job.*

.    .    .    .    .

". . . You are to speculate how the police and the prosecution prepared this case. Well, perhaps to clean up this mess maybe Mr. Matthews ought to run for Prosecutor again and really get things straight.

"Counsel's arguments in this whole case reminds me of one thing, the kind of cases that you see on T. V., such as Columbo and some of those programs. I wish I had a detective like Columbo, any officer, Ada County, State Police, Boise City. He wanders around in those houses and he never gets a bad or smudged print. He always gets a perfect print. He never has a chain of custody problem with the print. All the prints are always recovered. He has always got about four or five assistants in the presentation of this and they are shuffling around and got their backs in this and they are going crazy.

"Then, while all this vacuuming and sweeping is going on, Columbo goes over

and sees a piece of paper on the floor and picks it up and sticks it in his pocket. Two weeks later the whole key to the case, and of course, he doesn't have a chain of custody and he doesn't put it in an evidence envelope and he doesn't put it in a locker; it's been in his coat pocket for two or three weeks.

"Ladies and gentlemen, all I want to urge to you [is] that this is not a T. V. case. This is a real live case. You may want to fault the police officers for not doing this or not doing that, perhaps we should. Maybe you would like to see it different, but I guarantee you that I have never seen a defense counsel that was satisfied with the way that the case was handled by the police. This is a real live case. This is on real live issues and real live facts.

"I am going to urge to you that you return a verdict of guilty as charged based upon the information and the facts that you have before you. Thank you." (Emphasis added.)

I have carefully examined the record in the case in a vain search of support for the State's argument that the "context" supported a vigorous "offense" in defense of the prosecutor's supposedly challenged integrity. Twenty of the 21 witnesses called during the trial were called by the State. Of these witnesses, perhaps the most damaging evidence of defendant's guilt was provided by the step–sister and step–brother of the defendant when they testified to statements which they attributed to the defendant on the day of the robbery.

It was the prosecutor himself who on direct examination of the sister insisted on bringing out that she had doubtful feelings against three of the officers, and her reasons:

"Q  Do you have any particular feelings with regard to myself as a prosecutor?

"A  No.

"Q  Do you have any particular feelings with regard to the officers that have been involved in this case, the investigating officers, either Phelps or Clough or Anderson?

"A  You mean personal feelings?

"Q  That is right.

"A  Well, as a person I guess everybody is all right. I don't like some of the things that was done or said.

.      .      .      .      .

"Q  Now, did you voluntarily give both of those statements to the officer?

"A  Well, I voluntarily give him a statement, yes.

"Q  Now, by 'well,' did you voluntarily give both, I should say?

"A  Well, I had to.

"Q  Why did you have to?

"A  Because I didn't want to get in trouble again and I didn't want to lose my kids.

"Q  Did the officer threaten you with any of his guns or–

"A  No.

"Q  –weapons?

"A  He didn't threaten me with a weapon or anything.

"Q  Did he threaten you at all?

"A  Well, he didn't threaten me, but he just told me that if I didn't cooperate that I was going to get in trouble again and that I already had a felony once and I could lose my kids.

"Q  Now, did he say that?

"A  Yes, Officer Phelps said—that is what he said. And so, I cooperated.

"Q  Now, is that specifically what Officer Phelps said word for word, or is that your recollection at this time?

"A  Well, he said you remember—he reminded me about being in trouble before and he said 'You didn't like that, did you' and I said, 'No.'

"He said, 'Well, if you don't cooperate, you can find yourself in trouble again.' "

It was also on the prosecutor's direct examination of this same witness that there occurred the first mention of the words "frame" or "frame–up"—which words were to play the dominant role in the prosecutor's summation to the jury. After establishing by the witness that Sharp had asked

her to dispose of a brown paper sack with a gun in it, the prosecutor required her to give the substance of her conversations with Sharp at that time:

"Q What did Mr. Sharp tell you at that time about that pistol and the robbery you had seen on T.V.?

"A He just said that—I can't remember that word he said. He was—that somebody was trying to—I don't remember the word he used. It mentioned frame, you know, and he didn't want to be caught with the gun. I asked him how come he wanted me to throw it away.

"Q Didn't he state to you that he used that gun to rob a store?

"A No, he did not.

. . . . .

"Q Did you still think he was joking when he gave you that paper bag containing the gun?

"A I still never, you know—we wasn't joking then when he gave me that gun and was worried about people framing him, and I was serious for him, yes.

"Q You mentioned the second time about people framing him. When did this come up?

"A After they got there, Chris was telling me that.

"Q Okay. You got some information from Chris, is that where you got the idea about some frame?

"A That is when we was talking about it.

"Q Did Mr. Sharp say anything along those lines?

"A Said he would be accused of robbing that—or a robbery."

Defense counsel on cross–examination of the witness did not at all pursue the "frame" or "frame–up" testimony which the prosecutor's examination had opened up. Instead, he immediately moved the witness to another reason for disposing of the gun handed to her by Sharp:

CROSS EXAMINATION
BY MR. MATHEWS:

"Q Vonda, at the time Butch or Charlie, your brother, asked you to get rid of this gun for him, there is another reason you did that for him; isn't there?

"A Yes.

"Q I don't want you to state what caused him to be in that particular status, but what was that other reason?

"A Because he had been in trouble and he is not supposed to have firearms.

"Q You knew what his status was, didn't you?

"A Yes.

"Q You knew he was on parole?

"A Yes.

"Q Was this one of the reasons, one of the primary reasons that you agreed to get rid of that gun for him?

"A That is the only reason I had for getting rid of this gun. He could get violated."

In considering the propriety of the prosecutor's closing remarks, and whether or not they constitute reversible error, we must bear in mind that the prosecutor is a judicial officer whose primary obligation is to ensure that the defendant has a fair and impartial trial. While the prosecutor is entitled to "liberal freedom of speech and range of discussion," *State v. Gilbert*, 65 Idaho 210, 218, 142 P.2d 584, 587 (1943), he must confine his argument to issues before the jury. *State v. Smoot*, 99 Idaho 855, 590 P.2d 1001 (1978).

One of the last witnesses to testify on the State's case was Officer Phelps. Asked on cross–examination if he recalled writing this statement: "I have spent many hours on this investigation, much of it on my own time without pay. I am prepared to spend even more time and will do anything I can to get Sharp convicted," Officer Phelps answered: "Those words sound familiar, yes."

Defense counsel left it at that, apparently satisfied to show the officer's bias against Sharp. The prosecutor, however, immediately brought forth that there was indeed such a statement, and it was in the form of a personal letter to the prosecutor, and then himself expanded the purported frame–up

issue which he would later discuss to the jury:

### REDIRECT EXAMINATION
BY MR. HOWEN:

"Q Mr. Phelps, was that a personal letter that you wrote to me?

"A Yes, it was.

"Q And you do know that counsel has a right to review every one of your reports, even personal correspondence?

"A I wasn't aware that that letter was in the case file, no.

"Q You did know that I would allow counsel to see my entire file?

"A Yes, sir.

"Q Let me ask you this way: Have you framed Charlie Sharp on this robbery?

"MR. MATTHEWS: Your Honor, I will object to that. I think this is an ultimate decision for this jury to make and I think also he can testify what was done or hasn't been done, but I don't think he can take away part of the jury in this case.

"THE COURT: Well, in view of your questions and his answers, I think he is entitled to answer that question. I will let him answer it one time, but I don't want to waste the time of the Court dwelling on it. You may answer.

"Q BY MR. HOWEN: Did you frame Charlie Sharp on this case?

"A Absolutely not."

I am unable to accept the proposition that the mere mention of the word "frame–up," brought forth by one of the State's witnesses, entitled the prosecutor to make himself the focal point of the case. Nor can I agree with the rationale of the Court's opinion that it may be gleaned from this record that defense counsel's opening statement may have incited the prosecutor to his "erroneous" conduct.

Here the prosecutor deliberately introduced a frame–up issue, and then argued to the jury that to acquit the defendant was the equivalent of a judgment of disapproval against the police and prosecutor. Even when the credibility or integrity of the State's officers is attacked, the prosecutor must scrupulously avoid conveying the impression to the jurors that in order to acquit the defendant they must in effect convict the prosecution. Yet this was precisely what happened. The prosecutor began by arguing that a frame–up—if it had been intended by the police—would have been done more effectively, and then suggested to the jury that if they so believed in that theory, they should "do one thing. You can acquit the defendant right now."

Almost identical prosecutorial language was employed in *People v. Lovello*, 1 N.Y.2d 436, 154 N.Y.S.2d 8, 136 N.E.2d 483 (1956). There the prosecutor in his closing summation said this:

"Gentlemen, with all the sincerity at my command, I say to you that if that conversation did not take place, in your judgment, you stop right there. Don't waste another ten seconds on this case. Come back and say that this defendant is not guilty. If that conversation did not take place, then I am an aider and abetter to Omark's perjury." 154 N.Y.S.2d at 9, 136 N.E.2d at 484.

In reversing the conviction the court there repeated its previous condemnation of the practice of a prosecutor "supporting his case by his own veracity and position." In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the court remarked:

"The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to

refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." 295 U.S. at 88, 55 S.Ct. at 633.

The prosecutor here went on to argue that only if the jurors rejected the theory of the frame–up could they convict the defendant. This line of argument, combined with the prosecutor's appeal for a verdict upholding his own reputation, had to make it appear to the jury that they could only acquit the defendant if they believed he was being framed. Such does not necessarily follow. The jury might have concluded that the police officers were prejudiced, over zealous, and vindictive—but nevertheless truthful, and also that the evidence was sufficient to establish guilt. The jury might also have found the evidence insufficient, regardless of police motivation. A similar situation was presented in the case of *United States v. Vargas*, 583 F.2d 380 (7th Cir. 1978):

"In the Government's rebuttal argument, Prosecutor Lytton explained at length that there were sharp, unavoidable differences in the testimony, so that somebody must be lying. After emphasizing the testimony of Agents Ricevuto, Garcia, Collins, Kowalski and Fanter, and explaining that if Vargas was believed, each of the agents must have lied, he concluded:

'these Federal agents have come in and testified under oath as to what they observed; and if you find the defendant not guilty, I want you to write on there that all of those people lied. Ricevuto is a liar. Garcia is a liar. Collins is a liar. Kowalski is a liar. Fanter is a liar.'

"The other alternative, Lytton informed the jury, was a verdict of guilty.

"Even assuming that the testimony of the prosecution and defense witnesses contained unavoidable contradictions, it of course does not follow as a matter of law that in order to acquit Vargas the jury had to believe that the agents had lied. If the jurors believed that the agents probably were telling the truth and that Vargas probably was lying—or even if the jury was convinced that all of the agents save Garcia were telling the truth and thought that Garcia probably was telling the truth—it would have been proper to return a verdict of not guilty because the evidence might not be sufficient to convict defendant beyond a reasonable doubt. To tell the jurors that they had to choose between the two stories was error. See *United States v. Stanfield*, 521 F.2d 1122 (9th Cir. 1975)." 583 F.2d at 387.

Because a criminal defendant is entitled to a fair and impartial trial and a verdict rendered on the basis of the evidence against him, the argument of the prosecutor in this case deprived the defendant of that right.[10] Such error, combined with the

---

10. Not surprisingly, on this issue the Court's opinion places no reliance on the very recent decision of *State v. Griffiths*, 101 Idaho 163, 610 P.2d 522 (1980), where the Court held that prosecutorial remarks, discussed as egregious, unprofessional and reprehensible, did not deprive the defendant of a fair trial upon the conclusionary statement that the State had (somehow) sustained the burden of proving that the error did not contribute to the guilty verdict.

Although the Court does, as it did in *Griffiths*, cite *State v. Smoot*, 99 Idaho 855, 590

P.2d 1001 (1978), a case wherein I concurred in affirming, the dissent in *Griffiths* pointed out that the innocuous prosecutorial remarks in *Smoot* were a far cry from what took place in *Griffiths*, and now in this case.

*State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979), is another recent decision of this Court not mentioned in the Court's opinion, either today, or in *Griffiths*. There the defendant, too, complained of prejudicial prosecutorial misconduct, where, as here, defense counsel apparently deemed it imprudent to object at the time and did not do so. We reviewed the

other errors discussed above, sufficiently prejudiced the defendant to the extent that it cannot be said beyond a reasonable doubt that the effect thereof was harmless.

defendant's challenges under our doctrine of "fundamental error." *See State v. White,* 97 Idaho 708, 551 P.2d 1344 *cert. denied* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976). In *Garcia* we affirmed unanimously, the defendant there being caught in the perpetration of his crime. There we were able to state as we did our "belief beyond a reasonable doubt that in light of the evidence presented, there is no reasonable possibility that the prosecutorial conduct complained of contributed to the conviction." 100 Idaho at 111, 594 P.2d at 149.

More importantly, in that opinion we stated our agreement that it is error for a prosecutor to express a personal belief in a case as to the truth or falsity of defendant's testimony. So holding, we applied the rule of *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), and held the error harmless in that case.

Of equal importance, we approvingly set forth therein the ABA Standards Relating to

Prosecution Function § 5.8 (Approved Draft, 1971), and we reaffirmed that which was said in *State v. Spencer,* 74 Idaho 173, 184, 258 P.2d 1147, 1154 (1953). Other than for the record of the evidence against Garcia, it is clear that we would have had to reverse.

Today, with this case following *Griffiths,* the trial bench may well wonder how to interrelate these decisions with *Garcia.* For my part, that which I fathom is that *Chapman,* instead of providing a sound rule for appellate review of alleged prosecutorial misconduct which necessitates reversal, has armed a majority of the Court with a new cliche whereunder it may affirm, as it does today, and did in *Griffiths,* by the simple conclusionary statement that:

"'We hold that beyond a reasonable doubt there was no reasonable possibility that the prosecutorial comments complained of here contributed to the conviction."